I

The United States District Court District of Delaware

Johnny Lopez                    ?, NO
        V                        |
Warden Phelps                    )
                                 )
                                 )
                                 )
                    Memorandum

FILED
APR 2 1 2008
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

4/17/08

Johnny Lopez
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

On June 26, 2003 we went to the Superior Court for the suppression hearing. The public defender did not use any memorandom of the law to support the suppression motion. Also he did not use any memorandom argument in my defense. The State did not present any probable cause to search my home on March 26, 2003. Also they did not provide a search warrant when they came to search my home. The search was conducted at 10:30 P.M. The only reason they searched my home was because according to them a confidential source told them that I had drugs and dirty urine in my room. Nothing was proven, which means that there was no probable cause to search my home at night time or any other time. See 11 Del. C. F 2308, Also See Henry V. State 977, 373 A 2d 573 Searches and Seizures Key 471 Searches and Seizures Key 146, Also See 11. Del 2F 2306 Application or Complaint for Search Warrant- See Pierson V State 338 A. 2d 571 Del (1975) See Dorsey V State Del. Supr 761 A. 2d 807 2000 See State V. Harris Del. Supreme 734 A. 2d 629 (1999) See US V. Knights 122 S. Ct. 587 (2001) See Illinois V. Lafayette Gates 462 US 213, 103 S. Ct. 2317 (1983) On November 18, 2003 we

2

went to the Suppression hearing and the public defender
did the same thing. On November 19, 2003 I filed a motion
of conflict of interest. This motion was never addressed
by the Court in my presence.

3

On Nov 20, 2003, after trial I supposed to the public defender to present my probation officer as a witness and he refused. The State presented four witnesses and each of their testimonies were perjury. The public defender refused to use my preliminary hearing transcript in my defense. The State did not present any evidence to support their conviction of P.W.I.T.D. The State has to prove that the drugs were found on the person's possession, making a transaction from one person to another. That was never proven in court. See 16 Del 2 E 4751 also see Del. Supreme Decision Monkos V. State Del Supr 696 A.2d 390 1997. See Shaman V. State DEL Supr 587 A.2d 444 1991. See Cline V State Del Supr 720 A.2d 891 1998. In conclusion, the two suppression hearing were improperly denied. No evidence was supported to convict me at trial. My 6, 4 and 14th Amendments of the US Constitution was violated. See preliminary hearing transcript from March 17, 2003, there was no search warrant presented in court. No reliability proof was presented at the trial. The only reason I'm in prison today is because the public defender did not request any evidence and refused to present the evidence I have in my defense.

4

I would like to request that this honorable court see fit to dismiss all charges in which I was convicted of an Nov. 28 and 21 2003. Reason being, the public defender did not represent me to the fullest extent of the law. Furthermore my constitutional rights were violated. By Delaware law they needed to obtain a special warrant to search someone's property at night time. See 11 Del. C 2308 The State of Delaware didn't have any probable cause to search this house at any time. There was no criminal activity at the house police and State agents searched. See 11 Del C.³ 2306 as well 11 Del C. 2307.

Dorsey v State 761 A. 2d 807 (Del 2000)
State v Baltus A.2d (Del Super. Ct Nov 18)
State v. Dick A.2d Del. Super Ct May 2007) Fink v State 817 A. 2d 781 (Del 2003) Mezzatesta v State 63 Del 445, 166 A2d 433 (1960)
Rossitto v State 234 A²d 438 (Del 1967)
Edwards v State 320 A2d 281 (Del 1974)
Dufree v State 246 A2d 173 (Del 1975) State v Church A2d (Del. Super. Ct. Dec 18, 2002
Illinois v Lane Cite No.81-438 cite as: 462 U.S 213, 183 S. Ct 2317 June 8, 1983. Theodore Payton v New York, Doie Riddick v New York Nos 78-5420, 78-5421, 445 U.S 573C April 13, 1980).

5

Shanson V US No 339 (333 US 10 68 S.CT 367)
(Feb 2,1948) US v Walther Richard, Leahawn
Lloyd Da costa and Headley Weir No 92-3524
(994 F2d 847) June 22,1993. US v Leland Earl Dart
No 84-5250 (747 F.2d 8263) (Nov 1984) Griffin
V Wisconsin (107 S.CT 3164 (1987) U.S v Knights
(122 S.CT 587 (2001) State V Werns 734 A2d
629 (1998)

There was no search warrant by the probation
administration. The only search warrant is from
court* as but it was never signed by the
Judge / Master / Commissioner / Court Official.
On June 26, 2003, Officer Dupont testified
at the suppression hearing that he recieved a
search warrant from the probation supervisor. However
I never seen this search warrant. There was never
a report written by Officer Dupont before he
testified. Officer Brian Filed an affadavid dated
3-6-2003 which is attached to my rule 16. My
Rule 16 is dated 3-24-03. Officer Dupont fabricated
a story in court stating he was the arresting Officer.
Mr Dupont was a witness. See affadavid from Brian
Witte of W.P.D dated 3-6-03

Sam

7

Officer Dupont testified that another Officer seen me (Johnny Lopez) throw drugs out of a window. My public defender and the prosecutor went into a room and instructed Officer Dupont what to say on the stand when he testified against me. See suppression transcripts dated 6-26-83, the first 5 pages were changed by my public defender Brian Bartley before they were sent to me. See pages 21, 22 of preliminary transcripts dated March 17, 2003. Officer White testified he saw a white object falling from the window. It's impossible to see something from inside of the house falling from the house on the outside especially at night. There was also shades up on the windows. See page 22. Officer White testified the only reason he arrested me (Johnny Lopez) is because he was the only person in the bedroom. So Officer Dupont fabricated a story that he seen me (Johnny Lopez) throw drugs out of a window. There was also 4 other people arrested in this house at the same time. See page 25 of the preliminary transcripts dated 3-17-83.

Respectfully Submitted

Johnny Lopez

4/17/08

Johnny Lopez
1181 Paddock Road
Smyrna, DE 19977

ATTACHMENT-A



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

BRIAN J. BARTLEY
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5135

April 3, 2003

Mr. Johnny M. Lopez, Inmate
SBI No. 00459748
MPCJF Gander Hill
1301 E 12th Street
Wilmington, DE 19809

    RE:  STATE OF DELAWARE v. JOHNNY M. LOPEZ
          ID No. 0303004588

Dear Mr. Lopez:

    Please find enclosed a copy of your Rule (16) Discovery packet that was sent to me by the State which consist of the following documents:

1.    Response to Rule 16 Discovery
2.    Indictment
3.    Police Officer's Affidavit.

    Your Case Review is scheduled for April 28, 2003.

Very truly yours,

Brian J. Bartley
Assistant Public Defender

BJB/ef
Enclosure

*10-17-03*
*SE KISO*
*M a Tur*



M. JANE BRADY
ATTORNEY GENERAL

**STATE OF DELAWARE**
DEPARTMENT OF JUSTICE

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630
TTY: (302) 577-5783

**KENT COUNTY**
102 West Water Street
Dover, DE 19901
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652
TTY: (302) 739-1545

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369
TTY: (302) 856-2500

**PLEASE REPLY TO:**   NEW CASTLE COUNTY

March 24, 2003

Counsel of Record
c/o Prothonotary
New Castle County Courthouse
500 North King Street, Lower Level 1
Wilmington, DE 19801

      Re:    STATE OF DELAWARE V. JOHNNY M. LOPEZ
              I.D. #0303004588

Dear Counsel:

      Enclosed you will find copies of the police reports currently in our file concerning the above case. If and when additional reports are received, copies will be forwarded to you.

      You may find certain redactions in the reports relating to names or addresses of victims and/or witnesses. While these steps are taken to ensure the safety of the State's witnesses, we also expect that you will not forward copies of these reports to your client or his friends or relatives.

      Beyond that information already found in the police reports, pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure, the State responds as follows:

Rule 16(a)(1):      Written, recorded or oral statements made by defendant or any co-defendant in response to interrogation by a person then known to the defendant to be a state agent:

                    See enclosed report(s).

Rule 16(a)(1)(E): Identity of Expert Witnesses.

A.      If the indictment contains a Possession With Intent to Deliver charge the State intends to call a drug expert to testify that the behavior and/or paraphernalia and/or quantity of drugs and/or currency possessed and/or the local customs practices and procedures and/or any other circumstances in the police report demonstrate an intent to deliver. The identity of that expert will be provided on the day of trial.

B.      The State intends to call a forensic chemist from the Medical Examiner's Office to testify concerning the chemical composition and weight of the substance seized.

Rule 16(a)(2):      Written reports of tests or analysis of victim, defendant, or evidence:

See enclosed report(s). If the Medical Examiner's report is not enclosed, it has not yet been received by our office. That report will be provided at case review. Of course, if the report indicates a defect in the indictment, you will be notified as soon as that fact is known.

Rule 16(a)(3):      Recorded testimony of the defendant before a Grand Jury:

None.

Rule 16(b)      Reasonable inspection of documents and tangible evidence. Inspection of relevant, material documents or objects will be permitted. The Chief Investigating Officer in this case is noted in the attached police report. If you wish to see the physical evidence seized in this case, please make arrangements to do so through him/her. Additional tangible evidence, if any, may be viewed only upon specific identification and a proffer of materiality.

At this time the State is unaware of any Brady materials beyond what may be contained in the police reports. If you believe such evidence exists, please advise me of the specific nature of your belief and I will respond.

If you have filed or intend to file a separate request for discovery, be advised that the materials contained herein comprise our entire response. Any additional request is objected to as being outside the scope of Rule 16. Should you wish to pursue the matter further, please file a formal motion pursuant to Rule 16(d).

Please consider this a request for reciprocal discovery, as provided in Rule 16(c), of written reports of any test or analysis made in connection with this case of the defendant, victim, or any physical evidence that are with the possession, custody, or control of the defense.

Very truly yours,

Andrew J. Vella
Deputy Attorney General

Enc.

State of Delaware vs. **JOHNNY M. LOPEZ**                     Case: **03 03 004588**

## Exhibit A

Charge Sequence: 001                Police Complaint Number: 30 03 020351    Arrest Number: 03000756

Charge: **TRAFFICKING IN COCAINE-5 GRAMS TO 50 GRAMS** In Violation of 16 Del.C. § 4753 AA2A F B

Location: 114 N DUPONT ST - WILMINGTON, 19805

TO WIT: JOHNNY M LOPEZ, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly possess at least 5 grams but less than 50 grams of Cocaine, as classified under Delaware Code, Title 16, Section 4716(b)(4).

Charge Sequence: 002                Police Complaint Number: 30 03 020351    Arrest Number: 03000756

Charge: **POSSESSION WITH INTENT TO DELIVER A NARCOTIC SCHEDULE II CONTROLLED SUBSTANCE-** In Violation of 16 Del.C. § 4751 000A F C

Location: 114 N DUPONT ST - WILMINGTON, 19805

TO WIT: JOHNNY M LOPEZ, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly and unlawfully possess with intent to deliver COCAINE, a Narcotic Schedule II Controlled Substance as classified under Delaware Code, Title 16, Section 4714

Charge Sequence: 003                Police Complaint Number: 30 03 020351    Arrest Number: 03000756

Charge: **MAINTAINING A DWELLING FOR KEEPING CONTROLLED SUBSTANCES-** In Violation of 16 Del.C. § 4755 00A5 F F

Location: 114 N DUPONT ST - WILMINGTON, 19805

TO WIT: JOHNNY M LOPEZ, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly maintain a dwelling at 114 N. DUPONT ST , which is used for keeping controlled substances in violation of Chapter 47, Title 16, of the Delaware Code of 1974.

Delaware vs. **JOHNNY M. LOPEZ**                    Case: **03 03 004588**

## Exhibit B

SBI Number: **00459748**                    Also Known As:
Date of Birth/Age: **Dec 24, 1967 (35)**    Sex: **Male**
Eye Color: **Brown**        Hair Color: **Black**        Height: **6'0"**    Weight: **220 lbs**    Race: **Black**
Driver's License:**NONE**                                Social Security Number:**000000000**
Address: **114 DUPONT ST**
     **WILM, DE 19805**

Phone:
Employer:**AL'S AUTO REPAIRS**
     **1707 CONRAD ST**
     **WILMINGTON, DE 19805**
     **(302) 658-6689**

Date and Times of Offense: **3/6/2003 at 2238**
Location of Offense: **114 N DUPONT ST - WILMINGTON, 19805**



Your affiant BRIAN WITTE can truly state that: THIS OFFICER RESPONDED TO THE
DEFENDANTS (LOPEZ, JOHNNY DOB 12-24-67) DWELLING ALONG WITH W-1', W-2 AND W-3 IN
REGARDS TO AN ADMINISTRATIVE SEARCH ON THE DEFENDANTS DWELLING. UPON ARRIVAL
THIS OFFICER ALONG WITH OFFICER DUPONT W-1 RESPONDED TO THE FRONT DOOR AND
MADE CONTACT WITH A MELANIE ROSS WHO ADVISED THAT THE DEFENDANT WAS HOME
AND SHE WOULD CALL FOR HIM TO COME DOWN STAIRS. THE DEFENDANT THEN
RESPONDED TO THE FIRST FLOOR AND OBSERVED THESE OFFICERS STANDING AT THE
FRONT DOOR AND QUICKLY TURNED AND RAN UP THE STAIRS INTO HIS BEDROOM. THESE
OFFICERS THEN FOLLOWED HIM AND AS WE RAN UP THE STAIRS THIS OFFICER OBSERVED A
WHITE OBJECT FALLING FROM A WINDOW AND THEN I HEARD A CRASH. THE OBJECT WAS
LATER DETERMINED TO BE A GLASS PLATE. THIS OFFICER ALONG
WITH W-2 KICKED IN THE DEFENDANTS LOCKED BEDROOM DOOR AND OBSERVED HIM
COMING FROM THE BEDROOM WINDOW. THE DEFENDANT WAS THEN TAKEN INTO CUSTODY
AND THIS OFFICER THEN LOOKED OUT OF THE WINDOW AND OBSERVED A PLATE BROKEN
ON THE GROUND BELOW, WITH A CLEAR PLASTIC BAG WITH WHAT APPEARED TO BE A TAN
CHUNKY SUBSTANCE INSIDE. THIS OFFICER THEN RESPONDED TO THE REAR YARD OF THE
DWELLING AND RECOVERED THE 1- CLEAR PLASTIC BAG WITH A TAN CHUNKY SUBSTANCE,
LATER FIELD TESTED POSITIVE FOR COCAINE WITH A TOTAL WEIGHT OF 21.3 GRAMS. ALSO
FOUND ON THE WINDOW SILL UNDER THE DEFENDANTS BEDROOM WINDOW WAS 1- CLEAR
PLASTIC BAG CONTAINING A WHITE POWDER LIKE SUBSTANCE, LATER FIELD TESTED
POSITIVE FOR COCAINE WITH A TOTAL WEIGHT OF 1.0 GRAMS.
Affiant: BRIAN WITTE (00126) of WILMINGTON PD

Victim:                          Date of Birth              Relationship Victim to Defendant

_____
Affiant
Sworn and subscribed before me this 7th day of March AD, 2003

_____
Judge/Master/Commissioner/Court Official

Adult Complaint and Warrant
## In the Justice of the Peace Court
In and for the
State of Delaware

### State of Delaware vs. **JOHNNY M. LOPEZ**

I, BRIAN WITTE (00126) of WILMINGTON PD, do hereby state under oath or affirmation, to the best of my knowledge, information and belief that the above-named accused violated the laws of the State of Delaware by committing criminal acts in **New Castle** county on or about the date, or dates, and at or about the location, or locations, as indicated in Exhibit A hereto attached and made a part hereof.

Wherefore, your affiant prays that the above-named accused may be forthwith approached and held to answer this complaint consisting of **3** charges, and to be further dealt with as the law directs.

X
_____
Affiant

Sworn to and subscribed to before me this _____ day of _____, AD

_____
Judge/Master/Commissioner/Court Official

(To be completed by the Judge/Master/Commissioner/Court Official)
A. _____ The crime was committed by a child.
B. _____ A misdemeanor was committed against a child.
C. _____ A misdemeanor was committed by one family member against another family member.
D. _____ Other: Explain _____

### Warrant

To any constable or other authorized person:

Whereas, the foregoing complaint consisting of **3** charges, having been made, as listed in Exhibit A which is attached hereto and incorporated herein, and having determined that said complaint has been properly sworn to and having found that there exists probable cause for the issuance of process, based upon the affidavit of probable cause which is attached hereto and incorporated herein as Exhibit B, you are hereby commanded in the name of the State of Delaware, to take **JOHNNY M. LOPEZ** accused, and bring same before

**Justice of the Peace Court 20, FORTHWITH, to answer said charges.**

GIVEN UNDER MY HAND, this _____ day of _____, AD _____.

_____
Judge/Master/Commissioner/Court Official

Executed on _____ by _____
Case Number: **03 03 004588**   Warrant Number: 30 03 001133

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | INDICTMENT BY THE GRAND JURY |
| | ) | I.D. #0303004588 |
| JOHNNY M. LOPEZ | ) | |

The Grand Jury of New Castle County charges JOHNNY M. LOPEZ with the following offenses;

### COUNT I.  A FELONY

#N_____

TRAFFICKING IN COCAINE in violation of Title 16, Section 4753A(a)(2)(a) of the Delaware Code of 1974, as amended.

JOHNNY M. LOPEZ, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly possess **more than 5 grams but less than 50 grams** of a mixture containing **Cocaine**, a Narcotic Schedule II Controlled Substance as classified under 16 Del. C. Section 4716(b)(4) of the Delaware Code of 1974, as amended.

### COUNT II.  A FELONY

#N_____

POSSESSION WITH INTENT TO DELIVER A NARCOTIC SCHEDULE II CONTROLLED SUBSTANCE in violation of Title 16, Section 4751 of the Delaware Code of 1974, as amended.

JOHNNY M. LOPEZ, on or about the 6th day of March, 2003 in the County of New Castle, State of Delaware, did knowingly and unlawfully possess **Cocaine**, a Narcotic Schedule II Controlled Substance as classified under 16 Del. C. Section 4716(b)(4) of the Delaware Code of 1974, as amended, with the intent to deliver same.

## COUNT III.  A FELONY

#N_____

USE OF A DWELLING FOR KEEPING CONTROLLED SUBSTANCES in violation of Title 16, Section 4755(a)(5) of the Delaware Code of 1974, as amended.

JOHNNY M. LOPEZ, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly keep a dwelling at **114 N. DuPont Street, Wilmington, Delaware** which is used for keeping controlled substances in violation of Chapter 47, Title 16 of the Delaware Code of 1974, as amended, as set forth in Counts **I and/or II** of this Indictment.

## COUNT IV.  A MISDEMEANOR

#N_____

POSSESSION OF DRUG PARAPHERNALIA in violation of Title 16, Section 4771 of the Delaware Code of 1974, as amended.

JOHNNY M. LOPEZ, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did possess with intent to use or use drug paraphernalia to manufacture, compound, convert, produce, process, prepare, test, analyze, pack, re-pack, store, contain, injest, inhale or ingest into the human body a controlled substance in violation of Chapter 47, Title 16 of the Delaware Code of 1974, as amended.

A TRUE BILL

_____
(FOREPERSON)

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

State of Delaware vs. **JOHNNY M. LOPEZ**                Case: **03 03 004588**
SOCIETY/PUBLIC                                        Victimless Crime

_____
                          Affiant
Sworn and subscribed before me this 7th day of March AD, 2003

_____
                     Judge/Master/Commissioner/Court Official

State of Delaware vs. **JOHNNY M. LOPEZ**                    Case: **03 03 004588**

## Approval and Arrest Information

Approved by: **100926 : LOPEZ ROBERT C.**

Approved on: **03/07/2003** at **12:41 AM**

Approval Entered by: **CJPSGOL : SHERRI L GOLDSMITH**

Active Arrest Number: **03000756**

Date of Arrest: **03/06/2003** at **22:38**

Arresting Agency: **Wilmington PD**

Arresting Officer: **DELJIS JOSIE CHUDZIK (0)**

IN THE COURT OF COMMON PLEAS

FOR THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | Preliminary Hearing - March 17, 2003 |
| v. | ) | |
| | ) | Superior Court ID No. 0303004588 |
| JOHNNY M. LOPEZ, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE:

HONORABLE ALEX J. SMALLS

APPEARANCES:

KARA R. HAINES, ESQ.
for the State

EDWARD C. PANKOWSKI, ESQ.
Assistant Public Defender

JOHNNY M. LOPEZ
Pro Se

TRANSCRIPT OF PRELIMINARY HEARING

2

## INDEX TO TESTIMONY

| STATE'S EVIDENCE | Direct | Cross |
|---|---|---|
| Det. Brian Witte............................ | 9 | 17 |

- - - - -

3

THE COURT:   The next matter is number twenty-two,

Johnny Lopez.

MS. HAINES:   Yes. The officer --

MR. PANKOWSKI:   That's a pro se matter.

MS. HAINES:   -- is here.  And I know Mr. Lopez is, I believe

with an interpreter.

THE COURT:   All right. So --

MS. HAINES:   He is the pro se individual.

THE COURT:   He, he's represented --

MS. HAINES:   I, I think we had...

THE COURT:   -- by your office, Mr. Carey, Mr.

Pankowski?

MR. PANKOWSKI:   Your Honor, he had a preliminary

hearing last week. After his preliminary hearing, because he stated he

didn't understand Spanish, Judge Coppadge withdrew the preliminary

hearing, scheduled it for today, and dismissed us from representation,

because he was not happy with our services. In fact, there was a heated

argument between myself and Mr. Lopez on the record, unfortunately.

THE COURT:   He wasn't happy with your service?

4

MR. PANKOWSKI:    Well, in the cellblock, he talked fluent English; when he got to the courtroom, somehow, that changed.

THE COURT:    All right.

MR. PANKOWSKI:    So I was telling the Court that he spoke good English and I could understand him. And he was not happy with that.

THE COURT:    Well, it seems to me that that's the only representation you could make to the Court. That's your obligation --

MR. PANKOWSKI:    Right.

THE COURT:    -- be truthful to the Court.

Well, let's bring Mr. Lopez in. But he's already had a hearing? Was there a finding of, of...

MR. PANKOWSKI:    He was bound over.

THE COURT:    And then we vacated the bound over?

MR. PANKOWSKI:    Judge Coppadge vacated the hearing and scheduled it again. And I think Officer Witte, he's going to say, basically, what he said last week.

THE COURT:    All right. Well, we have an interpreter here today. Did, did Commissioner Coppadge appoint conflict counsel?

5

MR. PANKOWSKI:   No.  She just said if you want a

hearing, you're going to have a pro se hearing with an interpreter.  He

heard the hearing evidence once in English.  He seemed to understand it.

Now, evidently, he's going to hear the same --

THE COURT:   In Spanish.

MR. PANKOWSKI:   -- evidence in Spanish.

THE COURT:   I see.

Just a moment.

All right.  I think I've got a good understanding of this now.

All right.  I think Officer Witte is here, the interpreter is here,

the Public Defender's Office is here.  Let's handle this individual, then

we'll get back to Mr. Lopez.

MR. PANKOWSKI:   This is --

THE COURT:   All right.  Who, who...

MR. PANKOWSKI:   -- this is Lopez.

THE COURT:   This is Mr. Lopez.

All right.  Mr. Lopez, come to the podium.

MS. HAINES:   May I have the warrant on this matter,

please?

6

THE COURT:   Do you have an attorney?

MR. LOPEZ:   [In English] No.

THE COURT:   You don't have an attorney.

You were here before.  You were represented by the Public Defender's Office, is that correct?

(Maria Bird interpreted for the defendant, Johnny Lopez.)

THE COURT:   I think he understands English.

Do you not under, do you not write and speak English?

MR. LOPEZ:   [In English] I don't really understand English a little bit.  I, you know, I can speak a little bit.  But I don't really under...

THE COURT:   You can speak a little bit of English.

Okay.  To the extent you do not understand, she is here to assist you.

All right.  Now, you were here before, and you had a hearing, did you not?

MR. LOPEZ:   Yes.

THE COURT:   I see.

And at that time, you were represented by Mr. Pankowski?

MR. LOPEZ:   Before he was here, I asked him not to

7

represent me.

THE COURT:   All right.  So you wish to discharge the Public Defender's Office?

MR. LOPEZ:   I've always had problems with the public defender's.

THE COURT:   That, that is not the question.

The question is, do you wish to discharge the Public Defender's Office?  Do you plan to hire your own attorney?

MR. LOPEZ:   No.

THE COURT:   Do you plan to represent yourself?

MR. LOPEZ:   Yes.

THE COURT:   I see.

And how much education have you gotten in the formal or the educational system?

MR. LOPEZ:   Twelve years, high school.

THE COURT:   Twelve years.

Do you understand that that process in the Superior Court is a very complicated legal process?

MR. LOPEZ:   Yes.

8

THE COURT:   Do you further understand that if you are convicted of these charges, you will be required to spend a significant period of time in jail?

MR. LOPEZ:   Yes.

THE COURT:   Understanding those possibilities, and the complication of the legal system, do you still wish to represent yourself?

MR. LOPEZ:   Yes.

THE COURT:   These -- strike that. This is a scheduled preliminary hearing. Are you ready to proceed with the preliminary hearing?

MR. LOPEZ:   Yes.

THE COURT:   Good.

All right. We'll give you paper and pencil. And we can provide some space for him at the table. The public defender is discharged; you represent yourself.

Give him paper and pencil.

Have a seat here. Listen to the testimony of the officer. After he has testified, you may ask him any question for which you may have regarding the proceeding here today.

9

All right. If he wishes to object, then he should, either stand and object or communicate that to you and then you can communicate that to the Court.

MS. HAINES:    State calls Officer Witte.

THE COURT:    Before we swear him in, let's note on this transmittal document to the Superior Court that the defendant had a hearing, at one point, represented by the public defender, but after the commission, decided that he wished to discharge the public defender, that he dis, I permitted him to discharge it. We had a second hearing, and these matters are being transferred to the Superior Court with the defendant appearing Pro Se.

All right. Noted.

### STATE'S EVIDENCE

### DET. BRIAN WITTE

DET. BRIAN WITTE, having been duly sworn according to law, was examined and testified as follows:

### DIRECT EXAMINATION

BY MS. HAINES:

Q.    Officer Witte, you're employed with the Wilmington Police

Witte - direct                    10

Department?

    A.    Yes, I am.

    Q.    And in what capacity at this time?

    A.    I'm assigned to the Safe Streets Unit.

    Q.    What exactly is Safe Streets, briefly?

    A.    It teams probation officers, probation and parole officers with Wilmington police officers to go after subjects that are on probation that are currently violating their probation.

    Q.    Were you working in that...

    THE COURT:   Why don't we slow down just a little bit, so that each time after you testify, let's make sure that he understands, and before we ask the next question, all right?

    MR. LOPEZ:   [In English] Thank you.

BY MS. HAINES:

    Q.    Were you working in that capacity on March 6th of 2003?

    A.    Yes, I was.

    Q.    And were you assisted by probation officers at that time?

    A.    Yes, I was.

    Q.    Who was the probationer that you were going to?

Witte - direct                                              11

A.     Mr. Johnny Lopez.

Q.     Was he residing at 114 Dupont Street in Wilmington at that

time?

A.     Yes, he was.

Q.     Is that the residence that you went to?

A.     Yes, we did.

Q.     When you arrived, did you see the defendant inside?

A.     ~~No. When we arrived. We knocked on the door. We spoke to~~

~~a Miss Ross~~ who stated that the defendant was up in his bedroom; she

would call for him.

        While we were waiting for him to come downstairs, we

stepped inside the front door. We were there to do a curfew check and

then an administrative search. As the defendant walked down the steps, he

saw us standing in front of the door, inside the door. He then quickly

turned and ran back up the steps.

Q.     And what did you do upon seeing that?

A.     We, initially, started to run towards the steps. There was a

loose K-9 that had to be taken care of first. Once it was taken care of, we

started running up the steps. The steps are in two parts; there's a landing

Witte - direct                                          12

that you run, you go up two steps, then you go up another set of steps.

While I was on that landing, there's a window right there. I observed a

white object fall from the upstairs onto the ground, and it crashed.

Q.    And where is this window located?

A.    The window that I looked out of?

      It's right on the landing.  It goes into an alleyway.



Q.    So you saw an object coming from the window?

A.    I saw an object coming from above that came down in front of

the window that I was at.

Q.    I see.

      So the window was lower than where the object was coming

from?

A.    Correct.

Q.    Okay.  When you saw this object what did you, what could

you make out?

A.    A white object.

Q.    Okay.  So what did you do then?

A.    We then continued up the stairs, attempted to gain access into

the defendant's bedroom, which was, as soon as you went up the steps, it

Witte - direct                                                    13

was immediately to the left.

Q.    And where would his bedroom be in relation to the window

that you saw this object...

A.    The, the window, it would have been directly above --

Q.    Okay.

A.    -- where I was.

Q.    ~~Did you actually get up to the bedroom~~ ~~-~~

A.    ~~█~~

Q.    -- the defendant's bedroom, I'm referring to?

A.    ~~Yes. █ █ had to try to gain access, he had locked the door. So~~
~~we kicked the door in and observed the defendant coming from the~~
~~window,~~ walking away from the window, at that time.

Q.    And what window would this be?

A.    The window in his bedroom.

Q.    Okay. And how do you know that to be his bedroom?

A.    He told us it was his bedroom. All the opocant, occupants in

the house told us it was his bedroom.

Q.    And is, is that the room that it appeared he went directly to

when he ran back upstairs?

Witte - direct                                          14

A.     Yes.

Q.     When you later, did you later, you or another officer, do a search of the area outside where the object would have landed?

A.     Yes. When, when we went into his bedroom and observed him coming from the window, the, I wanted to see what the object was that had, had come down out of this, what appeared to be that window. I looked outside. There was a glass plate that was broken on, in the alleyway and there was a clear plastic bag with what appeared to be a tan chunky substance inside of the clear plastic bag. I then went downstairs, and went out to the alleyway and located that one clear plastic bag that later field-tested positive for cocaine with a total weight of 21.3 grams. Also, on the window ledge below the defendant's window, I observed a, one clear plastic bag, a smaller clear plastic bag with a white powdered substance, which also later field-tested positive for cocaine, total weight of 1.0 grams.

Q.     Okay. Now, the cocaine that was found by the window sill, how was that packaged?

A.     It was just one clear plastic bag twisted and knotted at the top.

Witte - direct                                    15

Q.    Okay. And the weight of the drugs that were found below, on the ground, that came from the window was 21.3 grams?

A.    Correct.

Q.    One moment, please.

Is his residence in New Castle County, State of Delaware?

A.    Yes, it is.

Q.    And where is Johnny Lopez? Do you recognize him in the courtroom?

A.    Yes. He's seated at the defense table, in the white DOC outfit.

Q.    Did you speak to Mr. Lopez at the time of the arrest?

A.    I did.

Q.    Did he appear to understand you well?

A.    Yes, he did.

Q.    Did you Mirandize him?

A.    No. He was not Mirandized, and he was not questioned. I explained to him his charges, and at which time, he became enraged.

Q.    What kinds of things was he saying? What do you mean enraged?

A.    He was, he was just getting agitated about the charges, saying

Witte - direct                                                    16

I had no reason for charging him with these charges, the drugs weren't his,
and all this.

Q.    One moment, please.

You charged the defendant, I know with trafficking, as well as
maintaining a dwelling, what forms the basis of the possession with intent
charge?

A.    The amount.

Q.    And what can you tell us, how many drug arrests have you
made in your career?

A.    In the neighborhood of five hundred.

Q.    And what does this amount, the 21.3 grams, as well as the
other 1 gram by the window sill, indicate to you?

A.    The person is packaging for sales they'll be selling that
amount.

MS. HAINES:    Nothing further at this time. Thank you.

THE COURT:    All right. I need the warrant, Mrs. Haines.
You can give that to the --

MS. HAINES:    Yes, Your Honor.

THE COURT:    -- bailiff.

Witte - cross                                    17

Mr. Lopez, do you have any questions for the officer

regarding the items or the, the testimony that he has presented here today?

MR. LOPEZ:    (Inaudible).

THE COURT:    If you do, come to the podium.  You can ask

the questions there.

## CROSS-EXAMINATION

BY MR. LOPEZ:

Q.    Police officer, you say you have a lot of experience, because

you've said you've made over five hundred arrests --

A.    Correct.

Q.    -- in, in drugs --

A.    Correct.

Q.    -- in drug charges?

That you, you should understand that any police officer or

anybody from the legal government, when they want to enter a, a residence

or a home, they have to have a, a warrant or a --

A.    That...

Q.    -- a...

MS. HAINES:    Objection, Your Honor. I don't believe that

Witte - cross                                                                18

that question is relevant to a preliminary hearing.

THE COURT:   Well, the, the reason why they were there is relevant to a, a preliminary hearing, because the officer --

MS. HAINES:   Well, I als...

THE COURT:   -- has to give a basis for why they, they were inquiring.  Were they --

MS. HAINES:   Well, I think --

THE COURT:   -- not?

MS. HAINES:   -- I think that might be; however, but I think the form of his question, Your Honor, was more in terms of an answer as opposed to a question.

THE COURT:   All right.  He's not an attorney.  I'll give him some leeway on this issue.  All right.

THE WITNESS:   Should I answer that?

THE COURT:   Answer the question.

THE WITNESS:   Okay.  The reason that we could enter without a search warrant is because when you signed up for probation, you signed over the right to have privacy in your own home with the probation officer.  They could search your house and any common areas.  Your

Witte - cross                              19

dwelling, meaning your bedroom and any common areas of the dwelling.

You signed that right over to them to be released from prison.

BY MR. LOPEZ:

    Q.    I understood that the one who was authorized to come into my

residence would be my probation officer, not anybody else?

    A.    Any probation officer could go in if they get information and

have reasonable suspicion that ill, illegal activity is going on in there.

    Q.    What was the reason that made you go to my home?

    A.    We had information that you had drugs in your house.

    Q.    Only information, because one person told you that there was

drugs in that house?

    MS. HAINES:    Your Honor, I believe that is clearly going

beyond the, the search at this point, and I would ask that that question not

be allowed.

    THE COURT:    The basis for his information is not a subject

for these proceedings. You may raise that question in the Superior Court.

You may not raise that question at this level of these proceedings.

Do you have any additional questions?

    MR. LOPEZ:    The reason I ask that question is because that

Witte - cross                                                    20

is not my home. I only have a room in that home, in that house.

THE COURT:   Then when he gets to the Superior Court, he may ask his lawyer to file a Suppression Motion. Suppression issues are not matters that we handle at this level of these proceedings.

MR. LOPEZ:   [In English] Okay.

BY MR. LOPEZ:

Q.     When you entered the house, you saw Mr. Lopez coming down the stairs and then going back --

A.     Correct.

Q.     -- and then running back?

How many times had you seen Mr. Lopez before that day?

A.     I've never seen him.

Q.     And how did you know he was the one running back in, in a home where there's a lot of people?

A.     The probation officer advised me that that was him.

Q.     He was not my probation officer. He's never known me or, or been in my house before.

A.     He had a photo of him.

Q.     I'm sorry.

Witte - cross                                        21

A.     He had a photograph that was taken at the time of, he went on probation.

Q.     It's a little ridiculous.

You say the probation officer, supposedly -- who's the one who saw Mr. Lopez throw the drugs from the window?

A.     Who saw him?

I saw the white object falling from the, at the window.

Q.     But you said it was a yellow substance?

A.     No. I said it was a tan substance inside of a clear plastic bag.

Q.     There's a difference between tan and white?

A.     Correct. There is.

Q.     Do you see that officer? Can you tell what color his uniform is?

A.     I'm sorry? What, which officer?

Q.     The shirt?

THE COURT:   Mr. Lopez, that goes beyond why we're here today. You may raise those issues in the Superior Court.

And as to -- he doesn't have to answer the question.

BY MR. LOPEZ:

Witte - cross                                    22

Q.    Where were you at the time that you saw that white substance --

A.    On the landing --

Q.    -- fall?

A.    -- of the steps.

Q.    And you could see Mr. Lopez from that place?

A.    No.

Q.    How, how can you be sure that, that he was the person that threw the stuff from the window?

A.    He was the only person in that bedroom.

Q.    That's not the only bedroom. There's three more other bedrooms on top, and they all face the patio.

THE COURT:    You have to wait until he answers the question before you asked another question.

BY MR. LOPEZ:

Q.    What I said is that all the windows that face that patio, they were all from bedrooms?

A.    The windows that I observed all faced the back. There was only one that faced the alleyway, which was his bedroom. And it was, the object that I saw came from directly above me, down.

Witte - cross                                        23

Q.    Who broke the door of my bed, or my bedroom door?

MS. HAINES:    Objection, Your Honor. That's not relevant.

THE COURT:    If you wish to suppress the search, you have

to raise that issue in the Superior Court.

MR. LOPEZ:    What I want to make clear at the pre,

preliminary hearing is that when they say I threw something out the

window, I was sleeping in my room.

THE COURT:    Well, maybe the proper question then is who

entered the room first.

Sir, sir, why don't we ask who entered the room first.

THE WITNESS:    That would be Probation Officer Rich

Negley.

THE COURT:    All right.  The probation officer came in

first.

Do you have any other questions on the entrance to the

bedroom?

BY MR. LOPEZ:

Q.    You, you just said that you saw me running from the window

to the front.  And now you just said that you were not the one who entered,

Witte - cross                                          24

who walked in first, who entered the bedroom first. How could you see

that?

A.    Because we were both standing in the doorway when forcing,

the door was forced open. I could see the defendant walking away from

the -- I didn't say he was running -- he was walking away from the window.

Q.    The probation officer was at the door. And now you're saying

you were there?

A.    No. I said he entered, entered first. We both were standing at

the same door.

Q.    Did you have your guns in your hands when you entered my

room?

A.    I did not, no.

Q.    That is, it, it's unbelievable that an officer with that, with

your experience would enter or break a, a room of a, a supposedly, a

criminal and didn't, and didn't have his gun in his hand.

MS. HAINES:    Objection, Your Honor.

BY MR. LOPEZ:

Q.    And if --

THE COURT:    I think he...

Witte - cross                                          25

BY MR. LOPEZ:

    Q.    -- you did...

    THE COURT:   On the objection, the objection is sustained.

It calls for a conclusion.  These are issues that are not the proper subject

for preliminary hearings.

    MR. LOPEZ:   [In English] All right.

BY MR. LOPEZ:

    Q.    How many people were arrested in that home, in that
residence?

    A.    I believe there was four subjects taken out of the house.

    Q.    And you, and you were looking for only one person?  You had

a search warrant for only one person?

    A.    That's correct.

    It wasn't a search warrant, though.  It was an administrative

warrant.

    Q.    So you were breaking the law because you were arresting

people that you didn't have to touch in that home, in that --

    MS. HAINES:   Objection --

BY MR. LOPEZ:

Witte - cross                                                    26

Q.     -- residence?

MS. HAINES:    -- Your Honor.  Legal conclusion.

THE COURT:    That's not a proper question.  He does not

have to answer.  The objection's sustained.

BY MR. LOPEZ:

Q.     What is the reason to have four people arrested in a home

where you find drugs and only one person is, is charged?

A.     We were there for the defendant.  I observed the object

coming from his bedroom, which was later determined to be his bedroom.

There was nobody else in that bedroom.  The other subjects were arrested

for outstanding warrants, not for the drugs.

Q.     A little ridiculous.

That when you go with a probation officer, do you go to

protect him, or like to be like, you know, just watch his back or...

A.     Yes.  We're partners.  He watches my back; I watch his back.

Q.     Did you have a, an order, or you just went like a friend?

THE COURT:    Mr. Lopez, do you have any further

questions that pertain to the nature of the charge or the nature of the

arrests?

Witte - cross                                    27

BY MR. LOPEZ:

    Q.    If you are sure that the back or, or the substance was thrown

from Mr. Lopez's window was really thrown from that window?

    A.    I'm sorry. I didn't understand that question.

    Q.    If, if you...

    THE COURT:    I guess, in essence, he wants to know are you

sure the bag was thrown from the win, his bedroom window.

    THE WITNESS:    The object that I saw was thrown from

that window, yes.

BY MR. LOPEZ:

    Q.    How could you see that window from inside the house when

there is more than four windows that, that look up --

    MS. HAINES:    Your Honor, asked --

BY MR. LOPEZ:

    Q.    -- that face the --

    MS. HAINES:    -- and answered --

BY MR. LOPEZ:

    Q.    -- patio?

    MS. HAINES:    -- I believe. We've gone through this.

Witte - cross                                              28

THE COURT:  I believe he has answered that question.  That

he was on the landing.  He saw the items pass by the window for which he

was standing.  The objection's sustained.

BY MR. LOPEZ:

Q.    So you found the drugs in, in the grass of the building, in the,

in, behind, in, in their yard?

A.    In the alleyway, directly belo, below the window.

Q.    And that, in that alleyway there is four windows.  It's

incredible that you could see from which window that package was thrown.

MS. HAINES:  Objection, Your Honor.  Not a question.

THE COURT:  That's in the nature of a comment.  And you

need to save those comments when you get to the trial level at the Superior

Court.  And you will be able to put that argument before the jury.

BY MR. LOPEZ:

Q.    Was there enough light in the place where the bag fell that

you could see, see him drop from, from where you were, from below?

A.    Enough light in the alleyway?

Q.    In all that yard?

A.    Well, I could see the alleyway.  And I saw a white object.  I

Witte - cross                                        29

don't know where the light was coming from that reflected, but it reflected

a white object.

Q.    So you can identify, like paper, or a bag, or any other thing

that would, fall from a window?

A.    It was a —

Q.    You could i...

A.    — white object that I observed falling from the, above me,

directly above me, and I heard a crash.

MR. LOPEZ:   [In English] I, I believe you, you needed this —

you see the movie, the Mission, Mission Impossible for Tom Cruise, the

glass. That's what you need to stop being ridiculous.

No more questions, Your Honor.

THE COURT:   I think I, we have —

MR. LOPEZ:   [In English] I got no more —

THE COURT:   — concluded —

MR. LOPEZ:   — questions, Your Honor.

THE COURT:   — these matters. Thank you, sir.

Anything further from the State?

MS. HAINES:   No, Your Honor.

30

THE COURT:    All right.  You may step down.

THE WITNESS:    Thank you.

THE COURT:    Mr. Lopez, would you please stand.

Mr. Lopez, you are here charged with trafficking in cocaine, between 5 and 50 grams.  You're here charged with the possession with intent to deliver controlled substance.  And you're here charged, thirdly, with maintaining a dwelling for the keeping of controlled substance.

Based on the evidence produced at this hearing, I am satisfied the State has put forth sufficient evidence to indicate that in all probability these offenses occurred, and you are responsible for the commission thereof.  Therefore, consistent with the laws in this state, you are hereby held for further proceedings in the Superior Court.

The bail in this matter will remain the same.

Now, Mr. Lopez, you may have difficulty comprehending the nature of these proceedings or the charges against you; however, it may be in your best interest to reconsider your position when you get to the Superior Court, as to whether you would want to avail yourself of the services of the public defender.

Now, under the laws of this state, you have the absolute right

31

to represent yourself, but as I said before, the proceeding in the Superior

Court is very complicated, and I would think you would do yourself a

disservice if you do not reconsider your position.

In essence, sir, you're held for these charges.  Bail remains the

same.  You're now to appear at some later date in Superior Court.

That will be all, sir.  You can go back with the officer.

- - - - -

32

## CERTIFICATE OF AUDIO MONITOR

I, Tina M. Buckingham, Certified Audio Monitor of the Court of Common Pleas, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the testimony adduced and proceedings had, as monitored and electronically recorded, in the Court of Common Pleas for the State of Delaware, in the case therein stated, as the same now remains of record in the Office of the Court of Common Pleas at Wilmington, Delaware.

WITNESS my hand this 8th day of October  A.D., 2003.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE )
)
)
v. )
)
) I.D. No. 0303004588
)
JOHNNY M. LOPEZ, )
)
)
Defendant. )

### NOTICE OF MOTION

TO:   ANDREW J. VELLA, Esquire
      Deputy Attorney General
      Department of Justice
      State Office Building
      820 North French Street
      Wilmington, DE 19801

PLEASE TAKE NOTICE that the within Motion to Suppress

will be heard on June 26, 2003 at the same time of the Contested

Violation of Probation Hearing now scheduled for June 26, 2003 at

10:00 a.m. as directed by Judge Gebelein on May 21, 2003.

BRIAN J. BARTLEY, Esquire
Assistant Public Defender
State Office Building
820 North French Street
Wilmington, DE 19801

2003 JUN -5 PM 4:11

Dated: PROTHONOTARY
FILED

Service of a copy of the
within is hereby acknowledged
this ___ day of June AD 2003

Attorney for

B-8

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE          )
                           )
                           )
        v.                 )
                           )     I.D. No. 0303004588
JOHNNY M. LOPEZ,           )
                           )
                           )
        Defendant.         )

### MOTION SUPPRESS

COMES NOW, the defendant, Johnny M. Lopez, by and through his attorney, Brian J. Bartley, and respectfully requests that this Honorable Court, pursuant to Superior Court Criminal Rule 41, to suppress any and all evidence seized as a result of illegal searches and seizures as having been seized in violation of the defendant's rights under the Fourth and Fourteenth Amendments to the United States Constitution, under Article I, Section 6 of the Constitution of the State of Delaware, and under Delaware Statutory and Common Law. In support of this motion, the defendant offers the following:

1.    According to the crime report in this matter, police and/or probation officers arrived at 10:38 p.m. at the dwelling located at 114 North DuPont Street, Wilmington, DE to execute a pre-approved administrative search warrant.

2.    Upon information and belief, the search and seizure had no prior judicial approval.

3.    The basis to approve the administrative search included hearsay information whose reliability is questioned.

4.    During the course of the search contraband was allegedly found.

5.    Defendant is not reported to have made any incriminating statements before, during or after the search concerning the drugs.

6.    Also found at the location were five (5) other individuals.

7.    Defendant was not the sole resident 114 N. DuPont Street.

8.    Upon information and belief, attached hereto is a copy of the Department of Correction Procedure 7.19 governing administrative search and seizure.

.9. Defendant contends that the search was unconstitutional and illegal based independently upon each of the following arguments:

a.    There was not "reasonable grounds" or "strong reason to believe that the room contained contraband;

b.    The search was not approved or conducted according to the existing probation regulations; and/or

c.    The probation regulations in their entirety as applied to, in the instant case, invalid and unconstitutional.

WHEREFORE, the Defendant respectfully requests that this Court suppress from evidence the money, drugs and statements (if any) taken (or made) during and after the administrative search of the room.

BRIAN J. BARTLEY
Assistant Public Defender

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION | 7.19 | 1 OF 4 |
| BUREAU OF COMMUNITY CUSTODY AND SUPERVISION | RELATED ACA STANDARD: 2-3160 | |
| DIVISION OF COMMUNITY SERVICES | RELATED DOC POLICY: 5.2, 8.32 | |
| SECTION: 7 SUPERVISION ACTIVITIES | TITLE: SEARCHES/SEIZURE | |
| APPROVED BY DIRECTOR: | | |
| EFFECTIVE DATE: 12-16-91 | | |

I. Authority:     11 Del Code 4321

II. Purpose:      To establish procedures for when and how a search of a offender or the offender's living quarters or property might properly be conducted.

III. Applicability: To all Division of Community Services employees

IV. Definitions:

   A.  Personal Search: A search of a offender's person, including but not limited to, the offender's pockets, frisking the offender's body, examination of the offender's shoes and hat and an inspection of the offender's mouth. An Officer conducting the search must be of the same gender as the offender.

   B.  Living Quarters and Property Search: A search of the offender's living quarters, which should generally be confined to areas actually occupied by the offender, and which would include common areas such as kitchen, bathroom, living room, etc. and the offender's property, i.e. automobile.

   C.  Contraband: Any item that a offender may not have in their control or possession pursuant to the Court, the Board of Parole, state or federal law or the conditions of supervision (i.e. deadly weapon, illegal drugs).

| STATE OF DELAWARE DEPARTMENT OF CORRECTIONS BUREAU OF COMMUNITY CUSTODY AND SUPERVISION DIVISION OF COMMUNITY SERVICES | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 2 OF 4 |
| --- | --- | --- |
| | TITLE: SEARCHES/SEIZURE | |

V. Procedures:

    A.    Types of Searches:

        There are two types of searches Officers may conduct. These include a personal search (a physical search of the offender) and a search of living quarters and property, including automobiles. Strip searches or body cavity searches by Community Services staff are prohibited.

    B.    Guidelines:

        1.    Before any search is conducted, Officers must first have the approval of a supervisor or designee, unless emergency circumstances dictate otherwise. The Pre-Search Checklist will be used to assist in the decision making process.

        2.    Personal searches will be conducted when a offender is taken into custody. Personal searches should as a rule be conducted by members of the same gender.

        3.    Officers should seek the assistance of other law enforcement officials when conducting a search of living quarters or property. This is to provide security only and they should not assist in the search.

        4.    Searches should never be made solely on the basis of a request from law enforcement officials, but should be the decision of the Officer.

        5.    Officers will strive to preserve the dignity of offenders in all searches conducted.

        6.    Whenever feasible, before a search is conducted, the offender should be informed that a search is about to occur, its location, and why the search is being conducted.

        7.    Generally, if the offender whose living quarters or property is being searched is not present, the officer should not enter the premises. A search should be conducted in the presence of an Officer or other law enforcement officers.

| STATE OF DELAWARE DEPARTMENT OF CORRECTIONS BUREAU OF COMMUNITY CUSTODY AND SUPERVISION DIVISION OF COMMUNITY SERVICES | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 3 OF 4 |
|---|---|---|
| | TITLE:    SEARCHES/SEIZURE | |

8.  In conducting searches, Officers shall disturb the effects of the offender as little as possible. Care should be taken to prevent infringement on the rights of other occupants of the dwelling.

9.  During searches, Officers should not read any legal materials, communication between the offender and an attorney, or materials prepared in anticipation of a lawsuit. This does not include business records.

10. If any items are damaged pursuant to the search of the offender's living quarters or property, the offender may file a complaint to the agency Director.

11. Officers who conduct the search should at a minimum, have received agency training as to these procedures as well as the methods and techniques involved in conducting personal and living quarter searches.

12. The offender should be given a written inventory of property confiscated. See section 7.21.

13. After the search has been conducted, a written report will be made using the agency "Arrest/Incident Report" form. A copy of this form should be filed in the case folder of the offender for whom the search was conducted. In addition to the information routinely requested by the "Arrest/Incident Report", this report should also contain information as to the reason for conducting the search, any items seized pursuant to the search and whether any damage was done to the premises or property during the search. A copy of the Pre Search Checklist will be submitted with the arrest/incident report.

C.  Decision Criteria To Search:

In deciding whether there are reasonable grounds to believe a offender is violating conditions of supervision or possesses contraband, or a offender's living quarters or property contains contraband, Officers should consider:

1.  Observation by a staff member.

2   Information provided by an informant.

| STATE OF DELAWARE DEPARTMENT OF CORRECTIONS BUREAU OF COMMUNITY CUSTODY AND SUPERVISION DIVISION OF COMMUNITY SERVICES | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 4 OF 4 |
|---|---|---|
| | TITLE:   SEARCHES/SEIZURE | |

3.   The reliability of the information. In evaluating reliability, attention should be given to whether the information is detailed and consistent, and whether it is corroborated.

4.   The reliability of an informant. In evaluating reliability, attention should be given to whether the informant has supplied reliable information in the past, and whether the informant has reason to supply inaccurate information.

5.   The activity of a offender that indicates the offender might possess contraband.

6.   Information provided by the offender which is relevant to whether the offender possesses contraband.

7.   Experience of Officers with a offender, or any similar circumstances.

8.   Prior seizures of contraband from a offender.

9.   Whether the offender has signed the Conditions of Supervision.

10.  Prior conviction pattern.

D.   Out Of State Searches:

No Officers shall conduct personal or property searches outside of the state.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE                    )
                                     )
                                     )
          v.                         )
                                     )      I.D. No. 0303004588
JOHNNY M. LOPEZ,                     )
                                     )
                                     )
          Defendant.                 )

O R D E R

AND NOW, TO WIT, this _____ day of _____,

A.D., 2003, the foregoing Motion having been heard and considered,

it is hereby;

     ORDERED _____

_____

_____

_____



                              _____
                                           JUDGE

1

1        IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
                 IN AND FOR NEW CASTLE COUNTY
2

3
         STATE OF DELAWARE        )      CRIMINAL PROCEEDINGS
4                                 )
                                  )
5                                 )
                vs.               )      ID No. 0303004588
6                                 )
         JOHNNY LOPEZ,            )
7                                 )
                     Defendant.   )
8

9     BEFORE:   THE HONORABLE RICHARD S. GEBELEIN, J.

10                                              PoJiN°16

11    APPEARANCES:                                    28

12
              NATALIE WOLOSHIN, ESQUIRE
13            DEPUTY ATTORNEY GENERAL
              For the State
14
              BRIAN J. BARTLEY, ESQUIRE ✓
15            ASSISTANT PUBLIC DEFENDER
              For the Defendant
16
      INTERPRETER:  Mr. Horey Jenkins
17

18                  .VIOLATION OF PROBATION HEARING.

19                     SUPPERESSION HEARING

20                      June 26, 2003

21

22

23

                       Jean Preston, CSR
                   Superior Court Court Reporters
                500 N. King  Street, Suite No. 2609
                   Wilmington, DE. 19801-3725

2

```
 1                    INDEX TO WITNESSES

 2

 3   WITNESS                              PAGE

 4

 5   WILLIAM H. DUPONT   DIRECT CROSS REDIRECT RECROSS

 6                          3    18    42      49

 7

 8

 9

10

11

12                      EXHIBITS

13

14   #   STATE'S EXHIBITS                 PAGE

15   1   Presearch Checklist..................6

16

17

18

19

20

21

22

23
```

1        MR. BARTLEY:  Your Honor, also seated at defense

2   table is Mr. Horey Jenkins who is here to assist if

3   need be as the interpreter for questions.

4        THE COURT:  Mr. Lopez, I have decided that

5   Mr. Bartley is going to represent you for purposes of

6   this hearing, and we're going to go ahead with the

7   violation of probation hearing at this time.

8        MS. WOLOSHIN:  Thank you, Your Honor.

9   The state calls officer DuPont.

10                   WILLIAM H. DUPONT,

11   Being duly sworn according to law testifies as follows:

12              ×          DIRECT EXAMINATION

13   BY MS. WOLOSHIN:

14        Q    Officer DuPont, how long have you been with

15   the Office of Probation and Parole?

16        A    Four and a half years.

17        Q    Are you currently assigned to a particular

18   part of Probation and Parole, to a particular unit of

19   the Office of Probation and Parole?

20        A    Operation Safe Streets, as of October of

21   2002.

22        Q    As part of Operation Safe Streets did you

23   conduct an administrative search on 114 North DuPont

4

1    Street on March 6th, 2003 at about 4 p.m. on the

2    afternoon -- Oh, I'm sorry.  It wasn't at that time.

3    It was, what date was it you conducted that search?

4         A    March 6th, 10:38 p.m.

5         Q    Prior to conducting that administrative

6    search, was there any information that you were

7    provided about the owner or occupant of 114 North

8    DuPont Street?

9         A    Yes.  At 1600 hours that date, on that date,

10   I was approached by officer Barrett, who supervises

11   Mr. Johnny Lopez on Level III Probation.  He informed

12   me at that time he received information from a source

13   who alleged that Mr. Lopez had been selling drugs

14   either out of his residence and/or business.

15              At that time I conducted a check of our

16   departmental status, which is our database, and saw that

17   Mr. Lopez had recently submitted a urine that was

18   returned back as positive for cocaine.

19              By then I conducted a check of our DELJIS

20   system, saw Mr. Lopez had a drug history, and is

21   currently serving probation for the charge of possession

22   with intent to deliver.

23              I took all of that information and spoke with

1    my supervisor, Pat Chronin, and based on everything that
2    we had been provided, the administrative search was
3    approved at that time.
4        Q    Prior to obtaining the administrative search
5    approval, did you prepare a pre-search checklist?
6        A    Yes.
7            (WHEREUPON, exhibit is received and marked
8    State's A for identification)
9        Q    Officer, handing you what's marked state's
·10    A. Ask you to look at that and explain to The Court
11    whether that is your pre-search checklist?
12        A    Yes, it is, and it has Mr. Lopez's name and
13    address at the top. It has a list of criteria that we
14    generally use to decide whether or not to conduct an
15    administrative search, which is signed by myself and
16    my supervisor, Pat Chronin. It also has the names of
17    the officers at the bottom that searched with me.
18        Q    And there are certain checkmarks on the
19    form?
20        A    Correct.
21        Q    And was that form prepared by you?
22        A    Yes.
23        Q    And does your name appear on it?

6
1        A    Yes.
2        Q    When was that checklist prepared?
3        A    On March 6th, after speaking with my
4    supervisor, approximately 1630 hours.
5        Q    Prior--at a time period prior to the actual
6    administrative search?
7        A    Yes.        ·
8        MS. WOLOSHIN:  Your Honor, at this time the state
9    moves into evidence what will be marked for
10    identification as State's Exhibit A.
11        MR. BARTLEY:  Your Honor, subject to any right to
12    cross examine, because of it's weight, only.
13        THE COURT:  It will become State's Exhibit 1.
14        (WHEREUPON, document is received and marked
15    State's Exhibit 1 in evidence)
16    BY MS. WOLOSHIN.
17        Q    Officer DuPoint, I'm now handing you State's
18    Exhibit 1.
19            Regarding the checkmarks, can you explain to
20    The Court what you have checked?
21        A    Yes. The first question is, is there a
22    strong reason to believe the defendant possesses
23    contraband based on his urine result and based on the

7
1    information provided from the source?
2        I checked off, YES, that there was a strong
3    reason to believe he did possess contraband.
4        Number 2. Is there a strong reason to
5    believe he is in violation of probation or parole?
6        I circle PROBATION, as he was a probationer.
7    and, YES, since I felt he did possess contraband and he
8    was in violation of probation.
9        Q    And would that also be true regarding the
10    fact that he had produced a urine which turned out to
11    be positive for cocaine?
12        A    Yes, that is correct.
13        For No. 3, information from a reliable
14    informant indicating the defendant possessed contraband
15    or was in violation of the law?
16        I checked off YES.
17        The informant that I was informed by was
18    Officer Barrett, who proffered the fact that Mr. Lopez
19    had a positive urine for cocaine and that corroberated
20    information that he had been provided it and the source
21    that he was in possession of illegal drugs.
22        MR. BARTLEY:  Your Honor, I object at this point.
23    The reliable informant is not Officer Barrett. So, I

8
1    object on the grounds of hearsay. If he is proffering
2    Officer Barrett as the reliable informant, I don't want
3    the proceedings to go any further until I make this
4    objection because Officer Barrett is not the reliable
5    informant, unless he is the person who has some type of
6    personal knowledge. There must be this other reliable
7    informant, or some other informant, so to speak, that
8    contacted Officer Barrett.
9        So I object, at least for this purpose, on the
10    ground of hearsay because I don't want that point to
11    pass.
12        Officer Barrett isn't an informant. He works for
13    the agency and didn't himself observe it.
14        MS. WOLOSHIN:  Two points with that.
15        Your Honor, I think what Officer DuPont is
16    suggesting is that Officer Barrett provided him the
17    information about this particular probationer.
18        My second point is that hearsay is admissible for
19    a violation of probation hearing. So -- and I think, if
20    Mr. Bartley wants to argue that, it's appropriate from an
21    argument standpoint as to why the defendant shouldn't be
22    found in violation.
23        THE COURT:  I think it is correct that hearsay

1 can be used. The Supreme Court's somewhat reluctant to
2 accept it as the only evidence in a violation of
3 probation hearing, but that is not what it is in this
4 case, it is setting the stage for probable cause. So.
5          MR. BARTLEY: Are we also dealing with the
6 suppression issue?
7          THE COURT: Yes, we are.
8          MR. BARTLEY: So, the violation of probation is
9 one thing and suppression is another.
10          THE COURT: Hearsay comes in, in a suppression
11 hearing.
12          MR. BARTLEY: Good hearsay does.
13          THE COURT: I'm going to deny the objection.
14          THE WITNESS: The next item -- Is the information
15 from the informant corroborated?
16          I checked off, YES. I believe that the positive
17 urine for cocaine was corroboration of the information
18 provided me that Mr. Lopez did possess drugs.
19      Q      And, that form was signed off by your
20 supervisor, Officer Chronin, correct?
21      A      Correct.
22      Q      And the other members of the Safe Streets
23 team that were probation officers that conducted the

10
1 search, is that correct?
2      A      One probation officer and two Wilmington
3 police officers assigned to our unit.
4      Q      And, you have been a probation officer for
5 four and a half years?
6      A      That is correct.
7      Q      Have you ever supervised probationers other
8 than with Operation Safe Streets?
9      A      Yes.
10      Q      You have?
11      A      Yes.
12      Q      And as part of a condition of being on Level
13 III probation, do probationers have to sign any
14 conditions of probation?
15      A      Yes, they do.
16      Q      And do any of the conditions that the
17 probationer signs, does the condition include anything
18 about searching of a person, a probationer's
19 residence?
20      A      Yes.
21      Q      What is that condition?
22      A      Condition 3. All probationers must report
23 as directed by their officer and/or permit probation

1 and parole officers to enter his house or dwelling at
2 any given time.
3      Q      And conduct a search?
4      A      Conduct an administrative search.
5      Q      And they sign that condition when they are
6 signed up for probation. Is that correct?
7      A      That is correct.
8      Q      And is that a condition that every
9 probationer has to agree to?
10      A      Yes.
11      Q      After the administrative search and the
12 pre-search checklist was signed off by your
13 supervisor, did you then proceed to 114 North DuPont
14 Street?
15      A      Yes.
16      Q      Was that the address that was listed for
17 Johnny Lopez?
18      A      Yes.
19      Q      What happened when you arrived at the
20 residence?
21      A      Myself and Officer Brown from the Wilmington
22 police, arrived, and the first state car, followed by
23 Officer Easterly, Officer Negley and Officer Witte,

11

12
1 and myself, went to the front door and knocked,
2 announced we were there to conduct a curfew check.
3          The door was answered at that time by an
4 unknown female there to later to be determined to be a
5 Melody Ross.
6          I informed her at that time I was with
7 Operation Safe Streets and I was there to conduct a
8 curfew check on Mr. Lopez.
9          At that time she called upstairs and asked
10 him to come downstairs.
11          By that time Officer Easterly and Officer
12 Negley were on the front porch by the front stairs --
13 not actually on the porch.
14          Mr. Lopez responded downstairs.
15          He made it about halfway down the landing,
16 took one look at Officer Witte and myself, and fled back
17 upstairs. At that time Officer Witte commanded him to
18 stop.
19          Mr. Lopez refused.
20          The unknown female in the residence had a
21 large dog, so it took us 15 or 20 seconds to navigate
22 around her and the dog in order to persue Mr. Lopez.
23          I proceeded up the stairs first followed by

13

1  Officer Witte. Officer Negley responded off the front
2  steps following Officer Witte and myself. Officer
3  Easterly, not knowing if Mr. Lopez was attempting to
4  leave the residence, responded to --
5      MR. BARTLEY: Objection.
6      At this point there is hearsay with no basis for
7  him knowing what this officer might or might not have
8  known.
9  BY MS. WOLOSHIN:
10     Q   Well, did you have any belief as to where
11  Johnny Lopez went?
12     A   Just that he went upstairs.
13     Q   And did you know whether there was any exit
14  to the outside from upstairs?
15     A   No, I did not.
16     Q   So was there any belief by you whether the
17  defendant, Johnny Lopez, was attempting to flee
18  outside of the residence?
19     A   Yes.
20     Q   And based upon that belief, did you or any
21  other officers do anything?
22     A   Yes.
23     Q   And what did the others -- you or any of the

14

1  other officers, do?
2      A   I proceeded to follow him upstairs, followed
3  by Officer Witte, who was followed by Officer Negley,
4  while Officer Easterly responded to the rear of the
5  residence.
6      Q   And then what happened?
7      A   When I reached the top of the stairs, there
8  were three bedroom doors, all of which were closed.
9  Officer Witte, Officer Negley and myself
10  systematically cleared each room.
11     Q   And the purpose of going into each room was
12  to do what?
13     A   To see if Mr. Lopez was in the room, hiding,
14  or if he had actually fled the residence through a
15  window.
16     Q   And there were a number of other people that
17  were in that residence?
18     A   That is correct.
19     Q   And did you ever find Johnny Lopez in the
20  residence?
21     A   Yes, we did. In the middle bedroom located
22  directly above the stairs leading up to the second
23  floor, Mr. Lopez was observed standing on the other

15

1  side of the bed near the upstairs window.
2      Q   And at some point when all of the
3  individuals that were in the residence were taken
4  downstairs, what did Officer Easterly observe?
5      MR. BARTLEY: Objection.
6      This is, this is the fourth person -- this is
7  clearly hearsay. He has no basis to know what that
8  person observed, so I'm going to object at this point.
9      MS. WOLOSHIN: Your Honor, I think The Court
10  previously ruled hearsay is admissible.
11     THE COURT: You have to lay a foundation as to
12  how he knows.
13  BY MS. WOLOSHIN:
14     Q   At some point after this entire incident,
15  were you made aware of any observations made by any of
16  the other officers?
17     A   Yes. While standing upstairs with Officer
18  Witte and Officer Negley, Officer Easterly contacted
19  Officer Negley via radio and informed him that while
20  standing in the backyard he observed Mr. Lopez drop an
21  object out the window.
22     Q   Did you overhear that conversation because
23  were you standing next to Officer Witte and you heard

16

1  it on the radio?
2      A   I overheard that conversation because it was
3  coming over my microphone as well.
4      Q   And, then Officer Easterly had seen
5  something drop out of the window. Did Officer
6  Easterly do anything?
7      A   Yes. He informed Officer Witte that he was
8  unable to get to the object dropped because of a
9  6-foot high picked fence between the residence and the
10  alley where Officer Easterly was standing, at which
11  time Officer Witte went downstairs through the kitchen
12  and retrieved the object.
13     Q   And, do you know either from speaking with
14  Officer Witte or because of your own knowledge what
15  that item was that was recovered by Officer Witte?
16     A   Yes. When Officer Witte returned, he had
17  two plastic bags, one containing a tan chuncky
18  substance believed to be crack cocaine, and the other
19  contained a white powdery substance believed to be
20  powdered cocaine.
21     Q   Were those substances that were recovered by
22  Officer Witte, were they later tested?
23     A   Yes. All of the evidence was transported

17

1 back to the Wilmington police. It was later field
2 tested and had gave back positive reaction for crack
3 cocaine and powder cocaine.
4   Q   And did you or any of the other officers
5 conduct a search of Johnny Lopez at that time?
6   A   Yes. Once Mr. Lopez was placed into
7 custody, Officer Negley conducted a pat down search
8 and recovered a large amount of you can can you can
9 you can.
·10   Q   Do you recall how many that was?
11   A   Yes. Total amount of US currency was
12 counted back at Wilmington police Turnkey, $807.00.
13   Q   Officer Negley conducted that search?
14   A   Yes.
15   Q   Was the substances that were recovered by
16 Officer Witte, were they weighed at all?
17   A   Yes, they were. The one bag with the tan
18 chunky substance weighed 21.3 grams that was
19 determined to be crack cocaine.
20       The second bag with the white powder
21 substance weighed 1.0 grams that was determined to be
22 powder cocaine.
23   Q   Do you see the person in the courtroom who

18

1 you have identified as Johnny Lopez?
2   A   Yes. He's seated right in front of me in
3 the white Department of Corrections uniform.
4       MS. WOLOSHIN:  Let the record reflect the witness
5 has identified the defendant.
6           CROSS EXAMINATION
7       MR. BARTLEY:  There were four members of the
8 team, who were the two officers --
9       THE WITNESS:  Brian Witte and Officer Brian
10 Easterly.
11   Q   Officer Negley and yourself were probation
12 officers. Is that correct?
13   A   That is correct.
14   Q   Okay. Now your duties as a probation
15 officer, did they include any supervision?
16   A   Just in the context of curfew checks.
17   Q   I believe in your direct examination you
18 said on the pretense of conducting a curfew check?
19   A   That is correct.
20   Q   And so the whole purpose of this was to do
21 an administrative search?
22   A   That is correct.
23   Q   Looking for?

19

1   A   Mr. Lopez.
2   Q   Looking for Mr. Lopez or looking for
3 contraband?
4   A   I wanted to make sure Mr. Lopez was home
5 without actually tipping off the fact that we were
6 there conducting an administrative search.
7   Q   But the true purpose was to conduct an
8 administrative search?
9   A   Yes.
10   Q   Do you have an active case load?
11   A   No.
12   Q   So you don't supervise probationers, do you?
13   A   No. At this point I have curfew checks I
14 conduct out of a roster.
15   Q   Right, but this night you were not
16 conducting a curfew check, were you?
17   A   I conducted a curfew check to verify that
18 Mr. Lopez was home, with the intention of searching
19 the residence, if he was home.
20   Q   Now, the actual supervising officer's name
21 is, Barrett?
22   A   Raphael Barrett.
23   Q   What was the source of his information? I

20

1 don't need a name yet.
2   A   I believe that he received a letter, not
3 sure who from, I believe The Court may have a copy of
4 that letter?
5   Q   Well, that would have been a letter from a
6 law enforcement agency?
7   A   I wouldn't know.
8   Q   Inmate? You don't know?
9   A   I believe it may have been an inmate.
10   Q   You believe it was an inmate. Now that
11 inmate or that source -- and please you don't need to
12 give any names -- but has that inmate been found by
13 the Court to be on previous occasions a proven,
14 reliable informant?
15   A   That, I don't know.
16   Q   Okay. Do you know anything about the
17 reliability of the letter sent to Mr. Barrett?
18   A   Again, I don't know.
19   Q   And the basis for knowing or believing or
20 suspecting Mr. Lopez might have contraband at the
21 house that day was information from Officer Barrett
22 received about 1600 hours. Is that correct?
23   A   That, and the fact that Mr. Lopez had

21

1  submitted a urine recently for cocaine as well as his[21]
2  criminal history.
3     Q    Okay. Well, let's talk about the fact he
4  submitted a dirty urine for cocaine.
5        You understand from your experience that
6  there are users who use cocaine; Is that correct?
7     A    Yes.
8     Q    Without having cocaine in their residence,
9  Is that correct?
10    A    Yes.
11    Q    Were you going there to use a user's
12  quantity of cocaine?
13    A    No, but under our guidelines, we don't need
14  probable cause. All we need is reasonable suspicion.
15  We determine reasonable suspicious conduct for the
16  administrative search and we consider many factors
17  such as criminal history, past arrests, information
18  provided, urines, and we take all these factors and
19  consider them, and that determines whether or not
20  there is enough reasonable suspicion, not probable
21  cause, to make the search.
22    Q    Okay. But it's not reasonable suspicion,
23  according to your own checklist. It's something more.

22

1  It's strong reason, isn't it?
2     A    Again, based on the urine and based on his
3  criminal history.
4     Q    And based on department guidelines, call it
5  strong reason?
6     A    Yes.
7     Q    And the strong reason that you had to check
8  YES was because you were told that by a fellow
9  probation officer?
10    A    I think I answered that. Again, it was
11  based on the dirty urine, the information provided by
12  Officer Barrett, and Mr. Lopez's established past
13  criminal history.
14    Q    What was the information provided by Officer
15  Barrett?
16    A    That he was selling drugs out of his house,
17  his business, and that was based on the information
18  provided to him from the source.
19        When you consider that with the other facts
20  at hand, yes, that gave me a strong suspicion.
21    Q    Now, going down to the third part of the
22  checklist. Reliable informant. You checked YES or
23  did the supervisor check YES?

23

1     A    I checked yes.
2     Q    Okay. And, what about the informant who you
3  don't even know who it is.
4        What made you believe that the informant was
5  reliable?
6     A    When I checked this off, I took the
7  informant, the person who informed me -- Officer
8  Barrett, who routinely receive information from police
9  officers regarding offenders. I consider them
10  informants to me.
11    Q    Okay. What information corroborated the
12  facts when you checked YES for the fourth item? Was
13  it because the information from the unknown -- I'm
14  sorry, from Officer Barrett, was corroberative --
15    A    The fact that Officer Barrett had recently
16  submitted a positive urine analysis for cocaine.
17    Q    Now, the approval. You obtained approval
18  from the supervisor?
19    A    Yes.
20    Q    That was signed?
21    A    Yes.
22    Q    Can you look at the, do you have your copy
23  of the checklist?

24

1     A    Yes.
2        THE COURT:  Is that Pat Chronin's signature?
3        THE WITNESS:  Yes.
4  BY MS. WOLOSHIN:
5     Q    Did he sign it before you went over there?
6     A    Yes, he did.
7     Q    Now, did you provided him with anything in
8  writing before you asked him to sign off on this?
9     A    No. I spoke with him in a case conference.
10  I informed him what I had been informed of by Officer
11  Barrett. I informed him I found case notes regarding
12  the urine. I informed him of Mr. Lopez's past
13  criminal history.
14    Q    And do you have no information that on that
15  day there were drugs being sold in that residence
16  other than what Officer Barrett told you?
17    A    That is correct.
18    Q    And Officer Barrett, is he still alive?
19    A    Yes.
20    Q    Still employed by the Department of
21  Probation and Parole?
22    A    Yes.
23    Q    Is he on vacation this week?

25

1    A    No. It's my understanding he was told he
2  did not have to appear for these proceedings.
3    Q    Further down the checklist. Pre-search
4  strategy. You checked YES, the police were called to
5  provided security?
6    A    Yes.
7    Q    Did that occur here?
8    A    Yes.
9    Q    Who called the police?
10    A    Officer Witte called the police.
11         After we had everybody detained, there were
12  four, five, six subjects that remained in the house -- I
13  believe it was five.
14         Marked units were called to assist with
15  security to watch them while we searched the residence.
16    Q    The checklist where police were called to
17  provided search security. Was that announced under
18  the category of pre-search strategy?
19         Was that something you do before you go out
20  to do an administrative search?
21    A    We called WILCOM prior to going in there; so
22  that's an automatic YES in my book.
23    Q    It is an automatic YES, because although

26

1  you're employed by Probation and Parole every night
2  that you're out there, you're traveling in a police
3  car. Is that correct?
4    A    No. We travel in a state car.
5    Q    You travel in a state car with a police
6  officer?
7    A    Yes.
8    Q    A Wilmington Police Department police
9  officer?
10    A    Yes.
11    Q    And are they at that time employed by the
12  department or by the Wilmington --
13    A    Wilmington Police.
14    Q    So, their function at that time is as a
15  police officer; Is that correct?
16    A    Yes.
17    Q    Now, is there any policy or practice that
18  when you do a search, that you do anything different
19  with respect to having the police involved or not
20  involved?
21    A    The police were there mainly for security
22  purposes, in case something is witnessed or in
23  plainview.

27

1    Q    Okay. So -- and that happens quite often,
2  doesn't it?
3    A    What's that?
4    Q    That police officers go into a house with
5  you, the Operation Safe Streets probation officers and
6  observe contraband or other matters in plainview and
7  then seize that as evidence?
8    A    Yes, yes.
9    Q    There was no prior judicial approval for
10  this search, was there?
11    A    No.
12    Q    Now, you talked about a pre-search
13  checklist, and that has been introduced as Exhibit 1.
14         Is there any other written documentation of
15  the search decision?
16    A    No.
17    Q    None that you know of that was made by the
18  supervisor?
19    A    No.
20    Q    Now the property here was owned by--
21    A    The property in question?
22    Q    Yes. Do you fill out a form that tells you
23  search information?

28

1    A    Are you saying the property in question, the
2  drugs or the--
3    Q    No, the real estate?
4    A    That, I don't know. Actually, I have on my
5  checklist that the residence searched, the owner was
6  George Thornton, I believe at that time. He's the
7  individual that said he was on the lease.
8    Q    And George Thornton was in fact present at
9  the time of this search?
10    A    Yes.
11    Q    And what rooms of the house belonged to the
12  defendant, if any?
13    A    He stated he stayed in the upstairs middle
14  bedroom where he was located. We also would have
15  access to any common area Mr. Lopez would have access
16  to.
17    Q    So you knew going in there that Mr. Lopez,
18  besides the common area, his, he was confined to the
19  middle bedroom. Is that correct?
20    A    Yes.
21    Q    How did you know that?
22    A    I believe Officer Barrett told me where
23  Mr. Lopez's room was.

29

1  Q    And Mr. Thornton, was he taken into custody
2  that day?
3      A    He was detained.
4      Q    Was he taken into custody?
5      A    No, he was not.
6      Q    Now, were there five people there that
7  night, five other people?
8      A    Yes.
9      Q    How many of them were also occupants of the
10 house?
11     A    I believe the female who answered the door
12 was an occupant.
13          I believe one of the subjects upstairs was an
14 occupant.
15          And I believe the other two individuals were
16 just visiting.
17     Q    You mentioned U.S. currency was recovered?
18     A    Yes.
19     Q    And you knew about that back at Wilmington
20 headquarters?
21     A    I was present when Officer Negley conducted
22 a pat down search of Mr. Lopez and found the currency.
23     Q    How much currency was found back at the

30

1  house?
2      A    None. It was found on Mr. Lopez's person.
3      Q    Going over to meet or conduct the
4  administrative search, Mr. Lopez, was that his name
5  that you knew him by?
6      A    Yes.
7      Q    Were there any other nicknames or street
8  names?
9      A    Johnny -- just Johnny Lopez.
10     Q    You weren't looking for anybody other than
11 Johnny Lopez?
12     A    Correct. We conducted curfew checks in the
13 past.
14     Q    Traveling back to Barrett's source of
15 information.
16          That source of information never named Johnny
17 Lopez, did it?
18     A    Again, I don't, I didn't actually read the
19 letter so I can't say for Officer Barrett whether the
20 letter specifically stated Johnny Lopez or not.
21     Q    Is there a way that you can find out? You
22 don't have the file?
23     A    No, I don't have his file.

31

1      MR. BARTLEY: Your Honor, I'm finished.
2  I'll just reserve the right to be informed as to
3  whether or not the letter that informed, from the
4  informant, named my client or somebody else.
5      I think that's a fair request.
6      MS. WOLOSHIN: Your Honor, I think this is a
7  little obscure.
8      First of all, no motion to suppress was filed.
9  We're doing this at the last minute at the request of the
10 defendant.
11     The defendant has been in jail like he said, 120
12 days, and anybody that they wanted to subpoena could have
13 been subpoenaed, and I think at this point to put the
14 onus on the state -- when we were never even noticed that
15 there would be a suppression hearing, is a little bit
16 unfair.
17     We're doing this at the request of The Court --
18 to do this at the last minute, and if Mr. Bartley would
19 like to look at something, then he needs to make that
20 request at another time.
21     MR. BARTLEY: Okay, I apologize. I thought there
22 was a motion to suppress filed.
23     THE CLERK: Yes.

32

1      MS. WOLOSHIN: There was one filed? Okay. Then
2  there is one more reason why Mr. Bartley could have
3  looked at those records prior to today's hearing or made
4  that request prior to today.
5      MR. BARTLEY: Can I approach sidebar?
6      THE COURT: Yes.
7      (WHEREUPON, sidebar conference off the record).
8      MR. BARTLEY: Your Honor, Ms. Woloshin has to
9  leave shortly, and I might go beyond the time she has to
10 leave.
11     MS. WOLOSHIN: Normally, I don't have time
12 constraints. Your Honor knows I will stay, but
13 unfortunately, today I do have a commitment at 5:30, out
14 of the office that I-- there is no way that I can change
15 it; so, I can go until about 5:10 and then that's even
16 pushing it, but I guess that I could streamline this
17 into saying that, you know, there was an administrative
18 search application that was approved.
19     But even if there was not, what was done, there
20 wasn't an administrative search conducted until the
21 defendant threw drugs out the window.
22     So even, let's say for example there was no
23 administrative search and the officers were there to do a

1  curfew check, which they have every legitimate reason to
2  do, they only went after the defendant and didn't even
3  conduct a search of any of the rooms except to determine
4  whether the defendant was in those rooms. And, there was
5  no search conducted until after Officer Witte -- or I'm
6  sorry, Officer Easterly saw the defendant throw drugs out
7  the window.
8      So even if we get rid of the checklist, the basis
9  of the suppression hearing, when the officers arrived if
·10  they were conducting a curfew check, which they said to
11  one of the occupants that they were conducting -- when
12  they left and came down the stairs, he then ran from the
13  officers, which--
14      THE COURT:  But I think there's clearly been an
15  admission that was only said so that they wouldn't tip
16  off they were coming and doing an administrative search.
17      MS. WOLOSHIN:  I recognize that. But I think
18  even if there was no administrative search that was
19  conducted, they still have a legitimate reason to be
20  there for a curfew check, and I think the officer even
21  testified they had been there before, and the officer
22  testified they wanted to make sure the defendant was
23  there.

1      There were two purposes of their presence in the
2  residence.
3      It was, one, to see if the defendant was there;
4  and two, to conduct the administrative search.
5      So if you take it from they were there to conduct
6  a curfew check or make sure the defendant was there,
7  because this was conducted around curfew check time --
8  even if they didn't have a valid administrative search to
9  conduct on the residence, that clearly was abandoned once
10  the defendant ran from them and dropped drugs out the
11  window.
12      Just so that we're clear, the only admissible
13  evidence or evidence that is in question here are the
14  drugs that were thrown by the defendant, himself, and the
15  drugs that were found on the defendant's person, or the
16  money that was found on the defendant's person.
17      There was nothing else found in the residence that
18  would be subject to any type of suppression because there
19  was nothing else found.
20      It was just the drugs out the window and the money
21  found on the defendant, which, if they were just there
22  for a curfew check it would be a valid and admissible --
23      MR. BARTLEY:  Well, --

1      THE COURT:  Your client's got something to tell
2  you.
3      MR. BARTLEY:  One other important fact.
4      The arrest warrant executed by the police officer
5  indicates that Negley and you kicked the bedroom door,
6  the door to the second bedroom, in. Is that correct?
7      A   Yes.
8      Q   And in fact you, he kicked that door in?
9      A   I believe Officer Negley did.
10      Q   Negley would have been?
11      A   The other probation officer.
12      Q   You believe that your report doesn't reflect
13  that?
14      A   I checked the rear of the second bedroom,
15  which is the room Mr. Lopez was found in. It was
16  cleared by Witte and/or Negley. I was standing there
17  supervising two other occupants in the rear bedroom.
18  However, the second bedroom, which is the bedroom, the
19  middle bedroom Mr. Lopez was found in, if that's the
20  bedroom I believe you're asking the question, that was
21  cleared by Officer Witte and Officer Negley.
22      Q   Right. So, when Officer Negley --I'm sorry,
23  when Officer Witte the police officer, writes in his

1  affidavit of probable cause that he along with another
2  witness, one of the probation officers, kicked in the
3  bedroom door--
4      A   I believe that was probably an issue of
5  fresh pursuit.
6      Q   Let's stop right there. At that point in
7  time, you say no crime occurs. Is that correct?
8      A   Again, Mr. Lopez was directed to stop, and
9  he fled up the stairs, ignoring a lawful command of a
10  police officer.
11      Q   Directed by?
12      A   Officer Witte.
13      Q   Officer Witte as a police officer -- I
14  understand you and he worked hand-in-hand every day
15  even though you are a probation officer, he directed
16  him to stop in his own home, arguably, without any
17  reason to have him -- without any basis to arrest him.
18  Is that correct?
19      A   Again, the purpose we were there was based
20  on information at hand. Routinely, when people coming
21  down the stairs during a curfew check do not look at
22  the officers and flee upstairs.
23      Q   But he didn't say anything threatening, did

37

1    he?
2        A    No. He locked at us, and just turned around
3    and fled.
4        Q    Before I lose the point I was trying to
5    make -- at that point in time, no one but no one had
6    seen any drugs being thrown. Is that correct?
7        A    At that point in time?
8        Q    Yes.
9        A    No.
10       Q    At the point in time the door was kicked in,
11   had anyone seen drugs being thrown yet?
12       A    Yes.
13       Q    Who?
14       A    Again, Officer Easterly was standing out
15   back. When the door was kicked in, Mr. Lopez was
16   standing by the window, and the drugs had already been
17   discarded.
18       Q    Officer Easterly identified him as the
19   person who threw the drugs?
20       A    He did.
21       Q    Did he?
22       A    Yes, he did.
23       Q    Is that in your report?

38

1        A    I'll have to check that.
2        THE COURT:    Let me ask a question as to the time
3    because I'm not sure where we are exactly.
4        Are you planning on calling witnesses?
5        MR. BARTLEY:    No, but I would like -- would Your
6    Honor entertain perhaps some short memorandum, because
7    there is some argument to be made here.
8        THE COURT:    Sure.
9        Mr. Lopez.
10       THE DEFENDANT:    This police, this probation
11   officer no participate. Police haven't any reason for
12   search my person, for the search my house; that's the
13   law, Your Honor, and the only person--
14       THE COURT:    That's what he's saying, he wants to
15   argue the legal issues involved.
16       THE DEFENDANT:    Talking about different police
17   Officer Witte, police. The money is not probable cause.
18   You can look over there. The money and the drugs
19   supposed to be together when you make probable cause.
20   You got a lot of confusion. Police, he say inside the
21   house, you can see nothing when you inside the house.
22   Outside, the house when dark out, 10:30 at night, Your
23   Honor.

39

1        MS. WOLOSHIN:    I think he's going to have to
2    testify. He just can't put this on the record.
3        THE DEFENDANT:    I can testify.
4        THE COURT:    Then what we need to do is pick a
5    time when additional testimony can be taken.
6        Tomorrow.
7        Are you around tomorrow?
8        MS. WOLOSHIN:    I am. I have a suppression
9    hearing with Judge Herlihy. I don't know what time. I
10   think State vs. Scott Brooks. So any time other than
11   that I'm available.
12       THE DEFENDANT:    Can I respond to your question?
13       MS. WOLOSHIN:    No, no.
14       THE CLERK:    They're at 9:30. Twenty-one cases
15   on. It will probably take me a while to get him
16   transferred. I'm sure everybody in records is gone. I
17   probably won't be able to get him over until later in
18   the morning.
19       MS. WOLOSHIN:    My only concern is Officer DuPont
20   has been here all day and he works tonight and he worked
21   last night.
22       That's my only concern.
23       I might be able to finish him tonight or in the

40

1    next few minutes. But if the defendant wants to testify
2    or if there is other testimony or other witnesses, any
3    documents, we can do that.
4        THE COURT:    Are there other questions?
5        MR. BARTLEY:    Yes, there's a pending question.
6        THE WITNESS:    Yes, my report does reflect that
7    Officer Easterly saw Mr. Lopez discard an object from
8    the window he was standing next to.
9        Q    He never himself went and retrieved that
10   object?
11       A    I already stated he was unable to do so
12   because of a fence between the alley and the yard,
13   which is why he informed Officer Witte.
14       Q    And so he was unable to identify the object
15   in his report, your report?
16       A    Again, my understanding, only that object
17   was found coming out of that window. But.
18       Q    But there was a fence, and no report by the
19   police or probation makes that connection, do they?
20       A    What is that?
21       Q    What was reportedly thrown out of the window
22   observed by one officer and retrieved by the other
23   officer, both of them were one and the same object?

MS. WOLOSHIN:  Okay.
Thank you.
I have nothing further.
BY MR. BARTLEY:
Q     And the only reason you would be verifying
he was home that evening, before you did the
administrative search, approved by your supervision,
you wanted to search when he wasn't there?
A     That is correct.
Q     So, really, the reason there wasn't one is the
beginning of your administrative search?
A     If that's what you want to call it.
Q     Well, all of the other reasons certify you
made of that residence, which said which did a very
entail an administrative search?
A     No, none of the other reasons did that.
Q     So, did you know he was going to be home when
you made the verification?
A     No.
MR. BARTLEY:  Nothing further.
MS. WOLOSHIN:  I have nothing further.
THE COURT:  Very well.
What we'll do, we'll adjourn until 11:30 tomorrow,

so that time we'll hear the additional evidence.
(WHEREUPON, the proceedings are adjourned at
9:10 p.m.)

I, John Marshall, Certified Court Reporter for the
Superior Court, State of Delaware, do hereby certify
that the foregoing is an accurate transcription of the
proceedings as represented by me to the extent that the
in the case of testimony to set out to which accuracy,
on the date herein stated, in the exercise and in extent
of the duties of my profession as a stenographer,
intended, and does not relate to myself, as well as
my power or attorneys in the cause title, or in which I am
in any of those to do.

Witness my hand this the day of May, 1992.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,        Cr. ID No. 0303004588

    Plaintiff,

v.

JOHNNY M. LOPEZ,

    Defendant.

BEFORE:  HONORABLE RICHARD S. GEBELEIN, J.

APPEARANCES:

    NATALIE S. WOLOSHIN, ESQ.
    Deputy Attorney General
      for the State

    BRIAN J. BARTLEY, ESQ.
    Office of the Public Defender
      for the Defendant

SUPPRESSION HEARING TRANSCRIPT
June 27, 2003

DOMENIC M. VERECHIA, RPR
SUPERIOR COURT OFFICIAL REPORTERS
500 N. King Street, Suite 2609, 2nd Floor
Wilmington, Delaware 19801-3725
(302) 255-0710

---

2

I N D E X

Johnny M. Lopez

MR. BARTLEY        page 5
MS. WOLOSHIN            page 16
MR. BARTLEY        page 24
MS. WOLOSHIN            page 29

B-49

---

3

1        June 27, 2003
       Courtroom No. 6F
2        12:16 p.m.

3    PRESENT:        RECEIVED

4        As noted.        JUN 2 4 2004

5        - - - - -    BY:_____

6            MR. BARTLEY:  I've consulted with him. I guess
7    we should bring him in and see where we're going.
8            THE COURT:  Okay. Let's bring him in.
9        (Pause.)
10            MR. BARTLEY:  Your Honor, one procedural matter
11    that Mr. Lopez brought up is that he recalls that the
12    witness yesterday was not sworn. I have no recollection
13    one way or the other, Officer DuPont.
14            THE COURT:  He was sworn.
15            MR. BARTLEY:  All right. I'm raising that
16    concern.
17            THE COURT:  The clerk administered the oath to
18    Officer DuPont before he testified.
19            MR. BARTLEY:  Then he's indicated he does wish
20    to testify. I'm going to try to have the evidence from
21    him limited to just the testimony. And then he is going
22    to make remarks after, I guess, I make my closing
23    remarks. So I might cut him off because I'm going to

---

4

1    try to develop what the factual issues are that support
2    his case.
3            THE COURT:  Okay.
4            MR. BARTLEY:  The State is going to
5    introduce --
6            MS. WOLOSHIN:  Right. The only document we had
7    talked about yesterday was the conditions of
8    supervision. I provided a copy to Mr. Bartley, which is
9    part of the probation file. We would like that marked
10    as the next State's exhibit.
11            THE COURT:  We'll do that and proceed.
12            MR. BARTLEY:  Your Honor, before we proceed
13    with our part of the case, I just want to reserve the
14    right at the end to say that the State has not presented
15    sufficient evidence. We have arguments about the
16    hearsay, quality of the hearsay, and whether it was
17    sufficient evidence. Rather than make that argument,
18    though, now, I'd like to bring Mr. Lopez to the stand to
19    develop our side of the case.
20            THE COURT:  Okay.
21            MR. BARTLEY:  Does the Court want the
22    interpreter sworn or --
23            THE COURT:  Yes.

-5-

1    (JORGE JENKINS was sworn by the clerk of the
2    court to interpret Spanish into English and English into
3    Spanish.)
          JOHNNY LOPEZ, having been sworn under oath
ɔ    ough the interpreter as a witness for the Defense,
6    was called to the stand and testified as follows:
7          THE INTERPRETER: For the record, I'm Jorge
8    Jenkins, certified interpreter for the court.
9
10                DIRECT EXAMINATION
11
12   BY MR. BARTLEY:
13     Q.   Good afternoon. Would you please tell the
14   Court who your probation officer was.
15     A.   Is the officer Rafael Barrett.
16     Q.   And that gentleman was not in the courtroom
17   either today or yesterday; is that correct?
18     A.   No.
19     Q.   And the gentleman, the witness who testified
20   yesterday, has he ever been a supervisor or a probation
21   officer with you?
22     A.   I have never seen him before.
23     Q.   Before yesterday or before the day that you

6

1    were arrested?
2      A.   Never. Even the day I was arrested, I didn't
3    have any knowledge of who had arrested me.
4      Q.   Okay. Going to the date that you were
5    arrested, and that would have been in what month of this
6    year?
7      A.   March 6th. Approximately around 11 at night.
8      Q.   And --
9      A.   11:30 at night.
10     Q.   And what were you doing just prior to officers
11   of some sort arriving at your house?
12     A.   I was sleeping.
13     Q.   And how long had you been sleeping, if you can
14   recall?
15     A.   Exactly I cannot tell you how long I was
16   sleeping, but I remember that I arrived my home around
17   9:30 that night. I took my pills that I had to take for
18   the pains in my body. My medicine is very strong. And
     I am not aware when I fall asleep.
       Q.   Do you take more than one type of medicine?
21     A.   I take two Motrin pills, 800 milligrams each;
22   and one pill, a muscle relaxation for my back.
23     Q.   Okay. Do you recall on the evening in question

7

1    individuals entering your house?
2      A.   Yes. I remember that they were pushing me in
3    the bed. And when I woke up, I have a couple of weapons
4    facing my face.
5      Q.   Were you in your own bedroom when that
6    happened?
7      A.   Yes, of course.
8      Q.   And had you been asleep at that time?
9      A.   Yes. They woke me up.
10     Q.   And had you been sleeping since approximately
11   9:30 or ten o'clock at that time?
12     A.   More or less, after I took my pills.
13     Q.   Now, where do you live?
14     A.   114 DuPont Street.
15     Q.   And how long had you lived there as of March
16   6th, 2003?
17     A.   Approximately about five or six months.
18     Q.   Do you have a lease for that house?
19     A.   I pay every week.
20     Q.   And do you rent the entire house?
21     A.   No. I just have one room.
22     Q.   Are there other rooms in the house, bedrooms,
23   other bedrooms in the house?

8

1      A.   Yeah, there are more. Three more upstairs and
2    two more downstairs.
3      Q.   And besides yourself, how many other
4    individuals lived in the house at that time?
5      A.   Normally the persons that live there were six.
6    But they're always different people visiting others in
7    that house.
8      Q.   And which person in the house do you pay rent
9    to, if there's someone in the house you pay rent to?
10     A.   The owner of the house is George Stunton. He
11   is the owner.
12     Q.   And was he living in the house at the time?
13     A.   Yes.
14     Q.   Okay. Let's return now to the point in time on
15   March 6th when you were awakened. By whom were you
16   awakened?
17     A.   In reality I cannot identify the person.
18   Because at the time I was awakened, I had two weapons
19   pointing at me, and I was very afraid. They handcuffed
20   me. They took me out. And they put me in my knees
21   downstairs.
22     Q.   Was anybody else with you when you were put
23   downstairs?

B-50

9

1    A.   All the persons that lived in the house at that
2    time, everybody was handcuffed in the same position as
3    me.
4    Q.   And do you recall what room that was?
5    A.   The one in the middle on the second floor.
6    Q.   Okay. And where was everybody taken to? Where
7    were all the people taken to?
8    A.   Outside of the house. Or what are you --
9    Q.   No. The room that you were taken to in
10   handcuffs, was that on the second floor or on the first
11   floor?
12   A.   Downstairs.
13   Q.   So was it in the middle room of downstairs?
14   A.   It was the living room.
15   Q.   And if you recall, were some people already
16   downstairs in handcuffs when you came down?
17   A.   Yes.
18   Q.   What was said to you in the bedroom, if
19   anything, when you were being handcuffed and brought
20   downstairs?
21   A.   Nothing. They just pulled me out.
22   Q.   Okay. Now, there's been a suggestion that you
23   saw some officers enter the house that night?

10

1    A.   Inside the house?
2    Q.   Yes.
3    A.   There were more police there than in the police
4    station that night.
5    Q.   Okay. Were they uniformed police officers?
6    A.   They were some with uniform and others without
7    uniform.
8    Q.   Did you, before being -- before the gun was
9    drawn on you or before being detained, did you go
10   downstairs?
11   A.   No. I never get out of my room once I arrived.
12   I do not get along with that people. I have that room
13   just because I don't have any other option as a place to
14   sleep.
15   Q.   Was there a lady that lived in the house at
16   that time? Was there a lady living in the house?
17   A.   There's one that lived there, but there are
18   also some women that go visit some of the men there.
19   Q.   Do you recall one of them calling upstairs to
20   you?
21   A.   I was sleeping.
22   Q.   Did you have an opportunity to hear the witness
23   yesterday testify?

11

1    A.   The Officer DuPont?
2    Q.   Yes.
3    A.   Yes.
4        MR. BARTLEY: May I rephrase the question, Your
5    Honor?
6        THE WITNESS: I listened to some of what he
7    said. I remember some of what he said.
8    BY MR. BARTLEY:
9    Q.   So you were present when he testified?
10   A.   Yes.
11   Q.   Now, he gave a version of what occurred that
12   had you coming downstairs and running back to your room?
13   A.   I read that in the police report. And that
14   surprised me a lot. Because the only time I go down
15   from my room is when I'm going out of the house. If I
16   would go downstairs, I see the police. And if I go
17   downstairs and I see the police, I don't have any reason
18   to go running. I don't have any capias. I didn't have
19   any problem. I have a probation to which I have never
20   been absent.
21       At the beginning I have few problems, but only
22   one month I have some problems. But I was never absent
23   to my probation. And he told me to follow the program.

12

1    I finished that program. And practically, in fact, it
2    worked, because I got away from all my bad habits. And
3    I don't hang around with people that use drugs anymore.
4        Even my old girlfriend have the same problem.
5    And we separated. My probation officer knows about
6    this. And he know that she was calling him, talking
7    things about me. And I was not doing it. My probation
8    officer knows about this because he even himself
9    mentioned this to me several times. And he was giving
10   the advice. Be careful with this woman. I told him I
11   have already cut off this relationship with her.
12       I didn't have any reason, because I consider
13   this would be very stupid to go downstairs from my room,
14   see the police, and run away from them, since I don't
15   have anything to fear. I think that, of the persons
16   that live in that house, somebody went downstairs that
17   had a capias, and when they saw the police, they run
18   upstairs.
19       MS. WOLOSHIN: I'm going to object to the
20   speculation. If he was sleeping, he clearly can't say
21   what happened.
22       MR. BARTLEY: Your Honor, I think that's a fair
23   comment in that I was going to try to let that be

13

1  perhaps commentary.

2          THE COURT: I'll sustain the objection. But he

3  can't know what was happening while he slept.

4          MR. BARTLEY: But we may raise that at

5  jument.

6          THE COURT: You can raise the hypothetical in

7  argument.

8          THE WITNESS: I am not saying something that

9  was happening while I was sleeping. I thought that

10  somebody might do this because I saw four people being

11  arrested right there. And they were taken to the

12  prison. Why were they arrested?

13  BY MR. BARTLEY:

14      Q.  Well, the Court would like us to focus strictly

15  on our case while I'm questioning you. And that fact

16  might be something that we might argue later to the

17  Court but not during your testimony.

18          Now, there was some testimony yesterday by

19  Officer DuPont that you had a dirty urine.

20      A.  I am telling you right now, when I started my

21  probation the first month, I got those kind of problems.

22      Q.  Okay. So what you meant when you told the

23  judge you had problems in the first month of your

14

1  probation is that you still had some drug problems; is

2  that correct?

3      A.  Yes. I was using drugs that first month. My

4  situation was very difficult. I had to be sleeping in a

5  mechanic garage. I was away from my family. And only

6  reason why — is because of my probation problem.

7      Q.  What I'm trying to get you to establish for the

8  judge was yesterday's probation officer wasn't able to

9  put a date on the dirty urine. Can you, if you recall?

10      A.  I started my probation around the beginning of

11  March of last year.

12      Q.  So you're unaware of any dirty urine that

13  you've had in, say, the six to nine months before March

14  2003?

15      A.  No. I stopped all that kind of activity.

16      Q.  And did your probation officer, Mr. Barrett,

17  ever tell you that you got a dirty urine after, say,

18  June 2002?

19      A.  No. Even he was giving me more time. I was

20  supposed to go there every week, and he was letting me

21  go see him once a month. I was doing everything okay.

22  I was in the program. I was working. And I was

23  contributing with the community.

15

1      Q.  Okay.

2          (Pause.)

3  BY MR. BARTLEY:

4      Q.  You've testified that you weren't using drugs

5  in almost a year before this happened; is that correct?

6      A.  The incident that just happened?

7      Q.  Yes.

8      A.  I don't want to do anything with drugs.

9          MS. WOLOSHIN: Your Honor, I'm going to have

10  that stricken as non-responsive. The question was: Are

11  you saying that you have not used drugs in the previous

12  year?

13          MR. BARTLEY: Can I withdraw the question? Let

14  me ask a more direct question.

15          THE COURT: The question is withdrawn.

16  BY MR. BARTLEY:

17      Q.  Were you selling drugs at any time after June

18  of 2002 or before -- no -- after?

19      A.  No.

20      Q.  And you weren't carrying drugs for another

21  person; is that correct, since June 2002?

22      A.  No.

23      Q.  Okay. Did you throw anything out of a window

16

1  on the night that you were arrested in March of this

2  year?

3      A.  I will have to be walking asleep. Because

4  several times I have told you that I was a sleeping.

5  And in my room there was no drugs.

6          MR. BARTLEY: Okay. I believe the factual

7  presentation is complete at this point.

8          THE COURT: Cross-examination.

9          MS. WOLOSHIN: Thank you.

10

11          CROSS-EXAMINATION

12

13  BY MS. WOLOSHIN:

14      Q.  You heard Officer DuPont testify that they

15  found $807 in your pocket?

16      A.  That's a wrong number. Are you sure that's the

17  number he said?

18      Q.  Well, how much money did you have in your

19  pocket?

20      A.  In my pocket I have $7 and about $2 and some

21  cents in change.

22      Q.  Officer DuPont testified yesterday that you had

23  had $807 in your pocket. You don't remember that?

17

1    A.   I remember having in my house, not in my
2    pocket, 800 and some dollars.
3    Q.   That wasn't my question. My question was to
     you whether you recall yesterday Officer DuPont
5    .ifying that when they searched you, they found $807
6    in your pocket. You do remember him testifying to that?
7    A.   Yes.
8    Q.   And you want this Court to believe that you
9    were sleeping with $807 in your pocket?
0    A.   The officer said that it was in my pocket. I
1    have never said they were in my pocket.
2    Q.   Okay. And you don't recall Officer Barrett
3    ever telling you that you had recently produced a dirty
4    urine, do you?
5    A.   That's false. I haven't seen Officer Barrett
6    in about five months.
7    Q.   Right. But I'm asking you, back in March 2003,
8    you don't recall Officer Barrett ever telling you you
9    had a dirty urine, do you?
0    A.   I didn't call and talk or call with my officer
1    in that date. In any day of March I never spoke with my
2    officer. I had an appointment with him the 11th of
3    March.

18

1    Q.   So you don't know whether he was going to tell
2    you that, that you had a dirty urine when you went to
3    see him?
4         MR. BARTLEY: Objection. Assumes a fact not in
5    evidence. There was no indication that there was a
6    recent dirty urine.
7         MS. WOLOSHIN: Yes, there was. There was
8    testimony that there had been a recent.
9         MR. BARTLEY: There was no date put on it, Your
10   Honor.
11        THE COURT: I'm going to allow the question.
12   BY MS. WOLOSHIN:
13   Q.   When was the last time prior to March 6th that
14   you had seen Officer Barrett? It had been the month
15   before; right?
16   A.   No. It was approximately two weeks prior to
17   being arrested.
18   Q.   Well, you said you only saw him once a month;
     right?
     A.   No. I said that he is the one giving me the
21   opportunity of doing this, of seeing once a month. Even
22   though the rules, I have said, I have to see him every
23   week. But that was his decision, not mine.    B-53

19

1    Q.   Mr. Lopez, I need you to focus on my questions.
2    Okay? They're being translated to you in Spanish. All
3    right? My question to you was whether you were seeing
4    him once a month.
5    A.   When he was deciding it, I was.
6    Q.   When did you start seeing him once a month?
7    A.   When I was doing everything okay.
8    Q.   I need a date, sir. What month?
9    A.   I cannot tell you exactly the month. Only
10   approximately. I started April last year.
11   Q.   April of last year you started seeing him once
12   a month?
13   A.   Sometimes once a month, sometimes every other
14   week.
15   Q.   Right. But you just told Mr. Bartley when he
16   was asking you questions that you were having problems
17   in June 2002.
18        MR. BARTLEY: Objection, Your Honor. I believe
19   the question was framed to say before June. I don't
20   believe he told me June. I said by June you had those
21   problems. So I don't want that -- my phraseology to be
22   adopted by him. Certainly wasn't his testimony.
23        THE COURT: Rephrase the question.

20

1    BY MS. WOLOSHIN:
2    Q.   You were having problems in the beginning of
3    your probation; correct?
4    A.   Only one month.
5    Q.   Only one month? Even though Officer DuPont
6    testified that you were given a dirty urine recent to
7    March 6th of 2003 when you were arrested?
8    A.   Officer DuPont is not my probation officer.
9    Q.   That's really not helpful, Mr. Lopez.
10        My question to you was you're characterizing
11   that you only have problems with your probation at the
12   beginning. And Officer DuPont testified that you had a
13   dirty urine recently to March 6th, 2003.
14   A.   Why they didn't take me to court then if that
15   was true?
16   Q.   You had been -- the police had been to your
17   house before March 6th, 2003?
18   A.   I am not in that house during the day. I don't
19   know what happens in that house during the day.
20   Q.   Mr. Lopez, do you have a difficulty
21   understanding even Spanish?
22   A.   What I have a problem with is that a person
23   wants me to answer something of which I don't have

21

1 knowledge about.

2    Q.    Let's make this very simple. The police had

3 been to your house before March 6th, 2003; correct?

4    A.    I just have knowledge of what happens in my

5 om.

6    Q.    They had been to your house before to conduct

7 curfew checks on you?

8    A.    Never in the house, always outside. They have

9 never come inside the house. They call me outside. And

10 they ask me about my probation officer and that's all.

11 They say, you're okay.

12    Q.    So they have conducted curfew checks by coming

13 to your house?

14    A.    In the front of the house, not inside my room.

15    Q.    Right. But they've knocked on the door to your

16 house and done a curfew check while you were inside the

17 house; correct?

18    A.    They have done it only two times. And a long

19 time ago, they have not done it.

20    Q.    So let me make this perfectly clear. The

21 probation officers have conducted a curfew check for you

22 at 114 North DuPont Street before March 6th, 2003?

23    A.    Yes.

22

1    Q.    Was that very difficult to answer?

2    A.    No.

3    Q.    Can you explain the broken window, the broken

4 glass in your bedroom? When did you break that?

5    A.    They have never been broken.

6    Q.    So if we had photographs of it being broken

7 March 6th, 2003 --

8         MR. BARTLEY: Objection, Your Honor.

9 BY MS. WOLOSHIN:

10    Q.    -- you would say they weren't broken?

11         THE COURT: There's an objection.

12         MR. BARTLEY: The objection is we're now

13 defense testifying. There's been no evidence whatsoever

14 that his window was broken. It's been an ongoing

15 hearsay objection. Mr. DuPont didn't even testify that

16 he knew it was his room. So I'm going to object on that

17 basis. There has to be -- that's my objection.

18         MS. WOLOSHIN: Well, he testified it was his

19 room where they found him. The defendant just testified

20 t was his room where the police found him. And you

21 asked him whether he ever threw anything out the window.

22         MR. BARTLEY: That's correct.          B-54

23         MS. WOLOSHIN: I simply can ask him about the

23

1 question that you asked him.

2         THE COURT: Why don't you ask him if there was

3 a broken window.

4         MS. WOLOSHIN: I did. He said, no, there was

5 not a broken window.

6         THE COURT: So the new question is what?

7         MS. WOLOSHIN: My question is: If we had

8 photographs of the broken window -- I'm just asking

9 him -- would that change his answer as to whether the

10 window was broken.

11         THE WITNESS: You'd have to remember that the

12 police pulled me out of my room. And if they broke the

13 window, I was not there to see it.

14 BY MS. WOLOSHIN:

15    Q.    So you want the Court to believe that Officer

16 DuPont was not telling the truth at all yesterday when

17 he testified, when he said that you ran from him and

18 that you threw drugs out the window?

19    A.    I don't want the Court to believe anything.

20 I'm sure that that is a lie, and I can prove it right

21 now with the report of the police I have here.

22    Q.    I don't know what that is. And that's not in

23 evidence.

24

1    A.    This is probable cause.

2    Q.    That's not in evidence, sir. You need to put

3 that away.

4         How often did you work?

5    A.    Approximately five days a week. And sometimes

6 I even have to work seven days a week, because I don't

7 have a steady job.

8    Q.    Did you get paid?

9    A.    Ever person that works is paid.

10    Q.    That's not true. Not everyone gets paid for

11 the work they do. Some people volunteer their time.

12    A.    That's not a job.

13    Q.    Well, it is to some people. I'm not going to

14 argue with you, because you seem to know everything.

15         MS. WOLOSHIN: I don't really have anything

16 else.

17         THE COURT: Okay.

18

19                REDIRECT EXAMINATION

20

21 BY MR. BARTLEY:

22    Q.    You were asked whether or not you wanted the

23 Court to believe that some or all that Mr. DuPont said

25

1  yesterday was not true. And you told the Court that you
2  were certain of that. And you wanted to prove that by
3  reference to by what, an affidavit of probable cause for
4  ur arrest warrant?
5      A.  Of course.
6      Q.  Would you like to explain to the Court.
7      A.  In this affidavit of probable cause, in this
8  police report, where the officer Brian White is saying
9  that he went to the 114 DuPont Street together with
10  Officer DuPont, and two more officers, which whose names
11  does not appear anywhere, it just have a W-1, a W-2, and
12  W-3 -- I don't think that's legal. Because those are
13  not names of any persons.
14      He went inside. Knocked the door. A young
15  lady opened the door for him. And she was told to yell
16  at me. He says that she yelled at me. He says that I
17  came down the stairs. And once I came downstairs, I run
18  away upstairs again. He followed me together with
19  Officer DuPont. And when he was running after me, he
20  saw something that was falling through the window
21  outside. He stopped and watched that. He run upstairs.
22  He broke the door.
23      Listen to this very carefully. He is running

26

1  together with Officer DuPont, who is Witness No. 1. He
2  breaks the door upstairs, which is Officer No. 2. That
3  officer was not inside the house. The only officers
4  that were inside were Officer Brian White and Officer
5  DuPont. The one they are stating here probably entered
6  in a magical way. I'm not going to stop here.
7      He broke the door. And he saw me coming from
8  the window. He went towards the window. And he looked
9  outside. And he saw something that he said it was drug.
10  It's ridiculous to being able to identify drug in the
11  middle of the night outside. I'm not going to stop
12  there.
13      Listen very carefully. He saw that outside.
14  It was already in the window where there was some light.
15  He could see whatever it was in the window. He went
16  outside. He picked up a bag, which he says he tested,
17  and that had drugs. He came back upstairs. And he
18  found another bag in the window in the same place where
19  he had been before. What was the reason for him to go
20  outside? Find the bag of drugs, come back again to the
21  window, and find another bag in the same place where he
22  was before, where he was before? Why he didn't saw that
23  the first place? Now I'm telling you why Officer DuPont

27

1  is lying.
2      Officer DuPont says that another officer saw me
3  from the back, and that he saw me throwing something
4  through the window. He went and picked up from the yard
5  and come upstairs. So now we have four bags of drugs
6  now. Officer White found two, one in the window and
7  another one in the yard. And the other one found two
8  bags in the yard. How many bags did they find in total?
9      Either Officer DuPont is lying or the other
10  officer is lying. And this lying has been built up for
11  about four months. Took me to the indictment of the
12  grand jury, taking this lie there. And they're still
13  stating that here.
14      And Officer White witnessed this in the
15  preliminary hearing, that he was the one who found the
16  drugs. It's impossible that he was able to see drugs or
17  even something falling from the window. Everyone knows
18  this. When a light is on inside a house, you cannot see
19  the dark side outside. Okay. Besides this, the window
20  has kind of a blind or a curtain covering it. They are
21  lying completely.
22      They said they have a search warrant. Still
23  yesterday they were stating that, that he signed it

28

1  himself. And they never showed me, that to me. He was
2  supposed to show that to me. They never take this to
3  the grand jury. I'm still looking for it.
4      Q.  All right. I'd like to move on.
5      The house that you lived in, would it had been
6  possible for someone to be running upstairs, and as they
7  ran upstairs, to see an object fall from your window?
8      A.  Is not possible. That's incredible.
9      Q.  And is that because the only window --
10      MS. WOLOSHIN: I'm just going to object to the
11  leading nature of these questions.
12      MR. BARTLEY: That's fine. Good. I'm trying
13  to...
14  BY MR. BARTLEY:
15      Q.  Are there windows on the side of the house?
16      A.  The house has windows all over. It's a house.
17      Q.  Okay. How about the staircase?
18      A.  No.
19      Q.  And then you testified the $807 was not found
20  in your pocket?
21      A.  No.
22      Q.  Did you have $800 in another location?
23      A.  Yeah. I was gathering money, making money in

29

1  order to rent another place and get out of that place.
2  But that money was not in my pocket. What am I going to
3  do with $800 in my pocket if I'm not going to buy or
4  invest anything? I was gathering it in order to rent an
5  apartment. And I was still short because the apartment
6  I was going to rent was $1200.
7    Q.  I need to ask you one question: Where would
8  that money had been?
9    A.  In the closet. It was in the closet.
10    Q.  In which part of the house?
11    A.  In the closet of my bedroom. I have a closet
12  in my bedroom.
13        MR. BARTLEY: I believe we're finished with the
14  factual presentation.
15
16              RECROSS-EXAMINATION
17
18  BY MS. WOLOSHIN:
19    Q.  I just want you to acknowledge that in the
20  affidavit of probable cause that you read that it says
21  that when they found the plastic bag outside it was
22  found with broken glass around it. Right? That's what
23  the warrant says, doesn't it?

30

1    A.  It just says that they found something broken.
2  But that was not from my window. That's not from my
3  property. Anybody can be in the yard.
4        MR. BARTLEY: Doesn't prompt any further
5  questions.
6        THE COURT: Okay. The witness may step down.
7        (Pause.)
8        THE COURT: Argument, first on the motion to
9  suppress.
10        MR. BARTLEY: Your Honor, there are different
11  limits for searches of houses by probation officers than
12  are applied to the police. Nonetheless, the Fourth
13  Amendment puts limits on those. And, in fact, the case
14  law says that they must comply with the requirements of
15  the policy adopted. The case I'm talking about is the
16  Harris case.
17        The procedure -- the policy, the procedure
18  number is 7.19. If they don't comply with that, then
19  the search under the language of Harris is -- violates
20  the Fourth Amendment.
21        I think there should be no doubting that the
22  intent to go there that night was to search this house
23  for drugs. The testimony was that the object of the

31

1  search was my client.
2        On direct, out of his own mouth, the probation
3  officer told you, under the pretext of conducting a
4  curfew check, you knock on the door. It's unrebutted
5  that the prior curfew checks had taken place outside.
6  But the fact that they might have gone there to conduct
7  a curfew check doesn't help the State in this case.
8        We cannot have the probation office and the
9  police office working too close. We cannot have them
10  being the left hand watching the right hand to help them
11  get evidence they couldn't have otherwise got. If there
12  had been probable cause, there could have been an application
13  for a search warrant.
14        THE COURT: They don't need probable cause for
15  an administrative search.
16        MR. BARTLEY: No, they don't. That's correct.
17        And that brings me to a point in this case.
18  It's very clear that -- first of all, very clear that
19  this probation officer was not -- it was not his
20  probationer. And it's very clear that the State was
21  unable to articulate any reason why they suspected that
22  he might have drugs other than reported -- they're
23  relying solely on the fact that one probation officer

32

1  told another probation officer that he had heard from a
2  source that there may be drug dealing. There was no
3  detail outlined. There was no particularity to
4  corroborate that. There was no reliability about that
5  confidential informant, if, in fact, one existed.
6        The probation officer who reportedly or
7  purportedly who told Officer DuPont, who works every
8  night with the police, they come in and testify to that.
9  He didn't talk about, yes, I heard from the police
10  officers or neighbors or another probationer or anybody.
11  So under the department's own guidelines, they must be
12  able to determine the reliability of that.
13        And they must corroborate that. And the only
14  evidence that they proffered to corroborate this
15  hearsay, and the hearsay which is not merely one degree
16  hearsay -- we don't know how many degrees hearsay it
17  is -- is that he had a dirty urine at some point in
18  time. They've offered no evidence as to when that dirty
19  urine was.
20        There has been evidence by the defendant that
21  clearly disagrees, refutes the testimony by Officer
22  DuPont, whose credibility as to all matters cannot be
23  just taken at face value because this far down the road

B-56

33

1  he still doesn't know the facts of the case, all the
2  facts of the case. Came here and wasn't able to answer
3  all the questions. The defendant testified and gave
4  specific reasons why he had this. The reason why the
5  $7 wasn't all in his pocket, very plausible
6  explanation, was prompted by questioning by the
7  prosecutor. It was developed that he had, through his
8  testimony he had $7 in his pocket and had $800
9  otherwise.
10      So the administrative search, the criteria
11 which were gone through or were proffered were done not
12 by the supervisor but were just checked by Officer
13 DuPont. And although he said yes, it was corroborated
14 and although he said, yes, it's a reliable informant,
15 there's no basis for that. There's no basis for him to
16 conclude that the informant in this case was reliable.
17 We cannot have one probation officer telling the other
18 probation officer to basically take what would otherwise
19 be inadmissible or unreliable hearsay. That cannot
20 happen. If that can happen, from now on the message is,
21 if you've got an unreliable informant, you can tell one
22 probation officer, they'll tell the next. So they did
23 not comply with their own regulations of having

34

1  corroborating it and having relied on a reliable
2  informant.
3      Still to this day they're unable to tell you
4  the nature of the informant, the nature of the
5  information, whether that informant had been reliable in
6  the past.
7      So we'd ask the Court to suppress the evidence
8  suppressed here. The fruit of the poisonous tree
9  doctrine does apply. They went there for that purpose.
10 They should otherwise comply with the warrant
11 application.
12      MS. WOLOSHIN: Officer DuPont articulated two
13 reasons why they went to the residence. The first one
14 was a curfew check to ensure the defendant was in the
15 resident after his curfew time, and the second one was
16 to administer an administrative search, which they had
17 applied for earlier.
18      When they arrived at the residence, a woman
19 answered the door and called the defendant downstairs.
20 Officer DuPont testified very clearly that as soon as
21 the defendant saw the police officer standing in the
22 downstairs area, he ran back upstairs. And Officer
23 DuPont was very clear that there was nothing searched in

35

1  that residence until they observed or somebody observed
2  the defendant throw an object out of the window,
3  which they later found out to be cocaine.
4      There was absolutely no search that was done of
5  his person, of his room. The only search that was
6  conducted was a cursory view of the bedrooms upstairs in
7  order to ensure that the defendant had fled, hadn't
8  gotten any weapons, because he had fled from them when
9  they arrived at the house.
10      So as far as the motion to suppress, it's
11 technically moot because there was nothing that they
12 found pursuant to the administrative search. Only thing
13 that they found was found outside the residence which
14 was dropped out of the window by the defendant prior to
15 the administrative search. It was only after the police
16 officers had recovered the drugs outside underneath the
17 defendant's bedroom window where the police officers had
18 seen him when they entered his bedroom did they conduct
19 a search of his person and found $807.
20      So as far as the motion to suppress, it should
21 be denied. Whether there was a technical default in the
22 administrative warrant is irrelevant because they didn't
23 even execute the warrant. They never even executed the

36

1  warrant until after they had found the drugs outside the
2  window. And the only thing that they searched which
3  proved anything of any evidentiary value was $807, which
4  was found in his pocket. There was nothing found in his
5  room. There was nothing found in any portion of his
6  residence. In fact, there was no testimony that was --
7  the police officer searched any other portion of the
8  residence. They only searched and found evidence, or
9  what is construed as evidentiary value; and that was the
10 $807 in his pocket, which is not pursuant to an
11 administrative search anyway.
12      So based upon the evidence that was presented
13 by Officer DuPont, the motion should be denied because
14 there was no search that was conducted pursuant to the
15 administrative search.
16      MR. BARTLEY: I can be very brief.
17      The focus is whether the administrative search
18 was approved within the guidelines and had sufficient
19 evidence, too, and it doesn't.
20      THE COURT: Nobody is challenging that it was
21 approved by Mr. Cronin, who was the supervisor.
22      MR. BARTLEY: I'm challenging whether he had
23 sufficient basis to.

B-57

37

1     THE COURT: But nobody is challenging that he
2  approved it.
3     MR. BARTLEY: No one knows. I have no
4  dependent knowledge that Mr. Cronin didn't sign off on
5  it. But the evidence is very clear that Mr. Cronin did
6  not do the check marks. The testimony was that it was
7  checked by Officer DuPont.
8     So the check marks, whatever that means, no, it
9  was -- we're not challenging that part of it. What
10  we're challenging is it should never had been approved.
11     THE COURT: Why's that?
12     MR. BARTLEY: Because there was no reliable
13  informant, no reliable information.
14     THE COURT: Do you need a reliable informant to
15  sustain a reasonable suspicion?
16     MR. BARTLEY: Well, under the guidelines, under
17  the department's guidelines, the reliability of
18  information in valuing reliability attention should be
19  given whether the information is detailed and consistent
20  and whether it's corroborated. And when we tried to
21  determine whether that, they were unable to proffer any
22  evidence about that. So they failed.
23     THE COURT: What the officer indicated, at

38

1  least as I understood it, he was looking at this in the
2  totality of circumstances, that you had someone who is
3  on probation for possession with intent to deliver
4  cocaine. There is an anonymous tip of some sort of
5  variety indicating that there is drug dealing activities
6  going on in the house where he lived. And there was a
7  number, and he didn't testify in any detail, but a
8  number of urines that had turned up positive for
9  cocaine.
10     Seems to me that there's a reasonable suspicion
11  that he may be living in a place where he shouldn't be
12  living if he's on probation for --
13     MR. BARTLEY: Your Honor, a failed urine does
14  not amount to qualify for an administrative search. If
15  it does, the regulation would say so.
16     THE COURT: One failed urine is not what we're
17  dealing with here.
18     MR. BARTLEY: What is the information that
19  we're dealing with about? There's drug activity going
20  on. That was the purpose of this hearing.
21     THE COURT: There's drug activity allegedly,
22  according to this anonymous tip. When you put that
23  together with the fact that the individual is on

B-58

39

1  probation for possession with intent to deal drugs and
2  has had a number of dirty urines --
3     MR. BARTLEY: I don't know what the number was.
4     THE COURT: I know that there's at least five,
5  because that's in the court record.
6     MR. BARTLEY: Okay.
7     THE COURT: I think that's got to be
8  investigated. What are they supposed to do? Wait until
9  somebody videotapes him with drugs?
10     MR. BARTLEY: No. But --
11     THE COURT: What they do, they go out to his
12  house. And they have -- first go to his supervisor and
13  said, Do we have enough to do this? The supervisor says
14  yes. It certainly wouldn't be enough to get probable
15  cause for a search warrant from a court. That's not
16  what we're dealing with. We're dealing with somebody on
17  probation that's in the community by the grace of the
18  court.
19     At that point they go there; and according to
20  the testimony, once the defendant sees them, he runs
21  upstairs. And the officer, who is out in the back of
22  the house watching to prevent an escape or whatever,
23  calls on the radio and says he sees him throwing

40

1  something out the window.
2     MR. BARTLEY: Well, Your Honor, so the Court is
3  saying irrespective of the reliability of the
4  information. Well --
5     THE COURT: Yeah.
6     MR. BARTLEY: Here's the problem with that.
7  Delaware constitution requires a warning. There is an
8  exception under the Harris case which says that if you
9  follow the regulations, and the regulations would
10  require there to be a determination as to reliability of
11  the information. And there's no evidence proffered --
12     THE COURT: Before we get totally hung up on
13  that, why are we talking about any of that if the drugs
14  are found outside the house?
15     MR. BARTLEY: Because if the administrative
16  search had not been approved, which it should not had
17  been approved, the police officers would not have gone
18  there to -- would not have gone there.
19     In other words, the State is making argument,
20  oh, it was found by the police, and they just happened
21  to see it.
22     THE COURT: Again, all that might become
23  relevant in the trial on the charge that's pending

41

1  against him for trafficking or whatever it is. But what
2  you've got in my mind is you have an abandoned property
3  situation to start off with, because whatever it was was
4  found outside; he is found upstairs in the room. So if
5  you wanted to retain any ownership or privacy in what he
6  threw out of the window, if he threw something out of
7  the window, it's hardly the way to do it. I don't think
8  there's a basis to suppress the evidence.
9       MR. BARTLEY: Okay. The search should not have
10  been approved. It didn't go through the Department of
11  Corrections guidelines. It must do that --
12       THE COURT: I think it did. I mean, the
13  officer went with his superior and got his approval to
14  do the administrative search, which is what the
15  guidelines request.
16       MR. BARTLEY: And require it to be a
17  consideration and reliability of information.
18       THE COURT: Right.
19       MS. WOLOSHIN: And we've had an evidentiary
20  hearing, and we know nothing about the reliability of
21  information. So it doesn't follow the guidelines.
22  That's what creates the exception.
23       THE COURT: I understand the guideline. Point

42

1  to me in what guideline where it says that a tip cannot
2  be considered in conjunction with other information that
3  you notice about the probationer. Where does it say
4  that?
5       MR. BARTLEY: A tip?
6       THE COURT: Yeah, a tip. We're talking about a
7  tip.
8       We're also talking about the fact that the
9  guy's had dirty urines. We're also talking about the
10  fact that he's on probation for possession with intent
11  to deliver. So where does it say in the guidelines that
12  you can't search based on the fact that he's been using
13  drugs or you can't search based on the fact that you had
14  a suspicion which you received information?
15       You have to look at this in the totality of the
16  supervision.
17       MR. BARTLEY: It would have been fine if the
18  person who made these decisions was able to articulate
19  anything about the information. So that's what the
20  guidelines call for.
21       THE COURT: Where's that in the guidelines?
22       MR. BARTLEY: (3), the reliability of
23  information. How reliable is this information? Not

43

1  after-the-fact evaluation, it's got to be a
2  pre-evaluation, you know, when you sign off on that.
3  Why am I signing off on that? Why am I checking that?
4  Why am I saying that -- could have said no. Could have
5  left it blank. So what's the reliability? Could have
6  gone there --
7       THE COURT: How about (5): The activity of an
8  offender indicates the offender might possess
9  contraband?
10       The fact that he tested positive for cocaine
11  sort of indicates he might possess cocaine, doesn't it?
12       MR. BARTLEY: Then if one of those establishes
13  that without anything else, then there would be no need
14  to consider them.
15       THE COURT: Prior conviction pattern.
16  Conditions of supervision.
17       I think that there was reasonable suspicion to
18  do a search, so.
19       MR. BARTLEY: That's all I have to say, Your
20  Honor. I think Mr. Lopez wants to be heard.
21       THE COURT: Mr. Lopez.
22       THE DEFENDANT: I want to use as an example,
23  the case where the Superior Court of the State of

44

1  Delaware denied the evidence in the case of State
2  against Harris. They denied the fact of the evidence
3  because of the police had made an investigation
4  concerning that person. The probation officer had made
5  his own investigation, as it says here. It says a
6  probation officer is supposed to have some independent
7  knowledge that there is a criminal activity or a
8  violation of probation been committed in a particular
9  location before conducting a search.
10       Probation officers are also required to
11  articulate to their supervisor why a search is necessary
12  and receive a supervisor's approval prior to conducting
13  the search.
14       The probation officer, he never register that
15  house. The one who was supposed to do this was the
16  probation officer. The police has no right to
17  participate in the search of the house, as it's stated
18  here. Police officers are not to take an active role in
19  the search but are present for security reasons.
20  Probation officers are permitted to enter the home and
21  search the common areas and living area of the
22  residence.
23       They were supposed to register the room where I

45

1  was living.

2        MR. BARTLEY: May I interject a minute?

3        (Discussion held off the record between

   Bartley and Mr. Jenkins.)

5        THE INTERPRETER: Please note that instead of

6  "register," it's "search," "search," please.

7        THE DEFENDANT: The probation officer has no

8  authority to use any kind of force to enter into my room

9  or the place where I live. They never knock the door

10  where I live.

11       The police officer states very clearly in the

12  report, we went upstairs and we break the door. They

13  didn't even ask if I had the opportunity to open the

14  door, if I was inside. They say they were "persecuting"

15  somebody which they thought it was me. They never saw

16  me in person before. The only one who really knew me

17  was officer Raphael Rivera, and he was not present

18  there. In another place...

19       All what they say they found in that house,

20  it's a police work. In the police report, it's not

21  stating anywhere that there was another police officer

22  in the back of the house. These facts only came up

23  yesterday. That is not stated in any police report

46

1  prior to yesterday. The State is trying to make up a

2  case just yesterday and not the day that it happened.

3  The officer stated that he run inside.

4        THE COURT: Which officer's report are you

5  reading from?

6        THE DEFENDANT: Brian White, that make the

7  report for the probable cause.

8        He said he saw me falling down the window.

9  According to what Officer DuPont said, he didn't have

10  any time to see anything falling from the window because

11  they had to wait till the landlord of the house came

12  downstairs and put the dog in the basement, which he

13  stated yesterday. Officer DuPont, at what moment was he

14  able to see something falling down the window? He

15  didn't have any time --

16       THE COURT: Mr. Lopez, I understand that you

17  want to argue this, and you want to say that there's an

18  inconsistency between this police report and the other

19  police report.

20       What I heard in the testimony was that the

21  officer did go inside with the probation officer. And

22  they're the ones that pursued up the stairs and came

23  through your door. They also heard on the radio the   B-60

47

1  call from the individual outside who was watching the

2  back of the house. And it is that individual who said

3  they saw the object being thrown from the window. The

4  object was picked up from outside of the house.

5        THE DEFENDANT: Let's suppose that that object

6  was thrown out the window. But there was no reason to

7  connect that object with me since they arrested three

8  more persons inside that house.

9        THE COURT: That's fine. That goes to the

10  trial. The only issue here at this point on is that was

11  it picked up and should it be suppressed.

12       THE DEFENDANT: According to the Department of

13  Corrections -- they were supposed to show me what they

14  found in the house. They never showed me anything. I

15  still at this moment don't know what they found.

16       THE COURT: I understand your argument, but I'm

17  denying the motion to suppress.

18       Now, we have to decide whether there's a

19  violation of probation that has been established.

20       THE DEFENDANT: Wait a second, please. Sorry

21  for interrupting you.

22       I think it's unfair to deny this suppression of

23  evidence for this person under the Delaware constitution

48

1  and under the Constitution of the United States of

2  America and in the Supreme Court of justice. Everything

3  that they did, according to all these laws, is illegal.

4        —   They never present me a search warrant, which

5  they were supposed to show me in the first place. They

6  never did that. They were supposed to search the place

7  where I live in my presence with what the law says.

8  They pulled me out, put me downstairs, and they did

9  whatever they wanted upstairs. I didn't know anything

10  what happened upstairs.

11       THE COURT: That's not the issue that we have

12  before us. The issue we have before us is whether

13  evidence which was found beneath your window and outside

14  of the house is admissible at a trial. What it proves

15  is something that has to be discussed at the trial.

16       THE DEFENDANT: They never proved that that

17  fall from my window. They say it falls from my window.

18  I was sleeping at that moment.

19       THE COURT: So if you were asleep, you don't

20  know what they saw or didn't see. All I'm trying to

21  say, the time for arguing the suppression is over.

22       THE DEFENDANT: Thank you.

23       THE COURT: The issue that we have is the

49

1  violation of probation.

2       MS. WOLOSHIN: Your Honor, I also think that

3  there are some charges for which he needs to be

4  sentenced from a previous trial.

5       Am I correct, Kate?

6       THE CLERK: Yes.

7       THE COURT: I'm not going to be able to do that

8  since it was a trial and he was convicted at it. I

9  think that has to be done by the judge from the trial.

10      MS. WOLOSHIN: The only reason I'm asking, I

11 wasn't sure why they deferred the sentencing. I don't

12 know if it was -- do you know, Kate?

13      THE COURT: It was deferred originally because

14 there were other charges that he was not found guilty

15 of, there was a hung jury.

16      MS. WOLOSHIN: I just wanted to make sure.

17 Okay.

18      THE COURT: Then after that he picked up some

19 new charges. And they were figuring that they could all

20 be placed in a plea, I guess. So it has to go back to

21 Judge Babiarz.

22      MS. WOLOSHIN: So I guess an important

23 question: Was he out on bail for the charges for which

50

1  he was found guilty? He must have, because he committed

2  new offenses. Am I right? Okay.

3       MR. BARTLEY: I think I can present argument

4  that might even move that concern about sentencing.

5       As Your Honor pointed out, that there's a

6  factual question that needs to be cited at trial. I

7  would also ask the Court to find that, for violation of

8  probation purposes, they did not prove by a

9  preponderance of the evidence and to not find him in

10 violation and to set the matter for trial.

11      (The following exchange is not through the

12 interpreter.)

13      THE DEFENDANT: Your Honor, I no got no charges

14 pending.

15      THE COURT: You don't have any charges pending?

16      THE DEFENDANT: No. That's bogus. You got

17 somebody else. You see my probation. That's why I

18 trying to find out why I got capias. I no have no

19 charges.

20      THE COURT: You haven't been charged with

21 trafficking?

22      THE DEFENDANT: Your Honor, I got no charges.

23 No kidding. I have here this paper. That's the wrong

51

1  person. Is not me. I got a capias, whatever. I did my

2  probation at any time. You got to find out who person

3  it is. That's something I want to be clear over here

4  today. They say I have a superior court capias. I have

5  no capias. I see my probation all the time. I no have

6  no capias.

7       MS. WOLOSHIN: Your Honor, I wasn't suggesting

8  there was a capias.

9       THE COURT: He has charges pending.

10      MS. WOLOSHIN: Yes. But he also was never

11 sentenced on previous charges.

12      THE COURT: Yes.

13      THE DEFENDANT: This charge drop when I pled

14 guilty. If the State asking me to plead guilty for the

15 possession with intent to deliver, you got to drop all

16 my charges; that's what I do.

17      THE COURT: Is that in the plea agreement?

18      THE DEFENDANT: Yes, that's the plea agreement.

19      THE COURT: Do you have a copy?

20      THE DEFENDANT: I don't have a copy. I'm in

21 jail, Your Honor.

22      THE COURT: It would be the possession with

23 intent file that would have it.

52

1       THE DEFENDANT: That's what I pled guilty for,

2  this case. And the case, you remember I go to the trial

3  for the trafficking before this case be -- all this case

4  be. It was not dismissed, mistrial. The State make a

5  deal with me. He made me pled guilty with the

6  possession of intent and drop all my charges. You got

7  to be clear with that. The prosecutor Vella do that.

8       (Pause.)

9       MR. BARTLEY: May we just deal with the issue

10 of violation of probation. Has the Court ruled on that

11 or is the Court still considering that? I believe he

12 jumped up at the end of my argument or the middle of it.

13      THE COURT: I am going to find that he's in

14 violation of probation. There's no question in my mind

15 that he was at the house, that he threw something from

16 the window. What he threw from the window has been

17 identified as drugs.

18      I'm also convinced that he's had at least four,

19 I think five dirty urines that have been documented.

20 And those in and of themselves have constituted a basis

21 for violating his probation, although they were somewhat

22 more dated than this incident.

23      MR. BARTLEY: He's completed Civogenics on June

B-61

53

1  12th, 2003. If you're going to sentence him today, we'd
2  ask that that be the sentence and he be discharged.
3         THE COURT: Mr. Lopez --
       THE DEFENDANT: You got confused today for me. I
5  don't know what the real situation. Talking about all
6  these charges --
7         THE COURT: All I'm talking about right now is
8  the violation of probation with possession with intent
9  to deliver cocaine.
10        THE DEFENDANT: You've got to find this Fast
11 Track together and this case. I didn't have a Fast
12 Track.
13        THE COURT: That's what this was was the Fast
14 Track. You had an opportunity, I think, to resolve new
15 charges and deal with this violation; right?
16        THE DEFENDANT: Yeah. I'm trying to find out
17 all the charges because I never had a trial, Your Honor.
18 All the charges be dismissed. I'm on probation. I see
19 my probation all the time. I got the charges, supposed
20 to come in court. So why not take me into the court?
21 What the charges open? I got almost 16 month. And my
22 probation, I never miss an appointment, never run into
23 my probation, never charge in the computer and come in

54

1  today.
2         MS. WOLOSHIN: I'm looking through the file,
3  because I was confused about the sentencing. I will
4  check with Mr. Vella. I did speak with him this morning
5  about it. He remembered it. And he remembered that he
6  needed to be sentenced on those charges.
7         There's an e-mail in the file about a nol pros,
8  but it looks like two files merged. And there was a nol
9  pros. And I'm not sure it was nol prossed because he
10 was found guilty of certain charges, so they nol prossed
11 the remaining.
12        What I will do is I will have Mr. Vella contact
13 Kate immediately and let her know whether that needs to
14 be set for a sentencing or not. I don't think either
15 way that will hold us up with the sentencing on the
16 violation of probation.
17        THE COURT: Now, with regard to the new
18 charges, they've got to be set for trial; right?
       MS. WOLOSHIN: Correct.
       (Pause.)
21        MR. BARTLEY: Your Honor, he's asking if I can
22 step and talk to him in confidence for a minute.
23        THE COURT: Okay.

55

1         (Pause.)
2         (The following exchange is through the
3  interpreter.)
4         THE WITNESS: Your Honor, I think when we went
5  to trial, all the charges, the trafficking charge,
6  possession, dwelling, the jury didn't find me guilty.
7  It was a mistrial.
8         We're talking about that case. The only thing
9  I'm guilty of is driving without a license and without
10 insurance. That car had insurance. They never were
11 able to prove I didn't have insurance. I did have the
12 letter from insurance.
13        I didn't know that the State was able to
14 continue that case since I have more than 16 months in
15 probation, and we never talk about that afterwards.
16 When they told me about the other case, I thought it was
17 something serious. But I remember the jury found me
18 guilty of driving without the license.
19        THE COURT: And failure to have insurance and
20 possession of a narcotic, controlled substance.
21        THE DEFENDANT: They dropped that case, Your
22 Honor.
23        THE COURT: Not according to the record I've

56

1  got. You were found guilty of three charges. The judge
2  directed a dismissal of one charge, and the others were
3  a hung jury. He dismissed the use of a vehicle for
4  keeping controlled substances. But that doesn't really
5  have to do with what we're dealing with today. We're
6  dealing with the violation of probation today.
7         THE DEFENDANT: Supposedly, we were here to
8  have a hearing of Fast Track.
9         THE COURT: That's what this was. And my
10 understanding was that you were given an offer to
11 resolve the new trafficking charges that were pending
12 against you, and you rejected the offer. You didn't
13 want to take it.
14        THE DEFENDANT: The problem is that the offer
15 was not clear to me.
16        MR. BARTLEY: No. It wasn't acceptable.
17 Three-year minimum mandatory.
18        THE DEFENDANT: They didn't tell me three
19 years. I just saw it. That's what it says. I want to
20 just make clear. How were those six months; eight years
21 suspended for four, four suspended for two, two
22 suspended for six months? And this plea is right there.
23 I don't understand. What's the reason? The plea is

B-6

57

1 right there. I just saw it about a minute ago.

2 MR. BARTLEY: For the last time.

3 THE COURT: Are you telling me that you might

4 be inclined to take that plea if it were three years?

5 THE DEFENDANT: Three years in prison?

6 THE COURT: Yes.

7 THE DEFENDANT: They're offering me six months.

8 How come they are offering three years?

9 MS. WOLOSHIN: Six months Level IV.

10 THE DEFENDANT: That's what the plea says.

11 THE COURT: That they were offering you six

12 months? I don't think so on a trafficking charge.

13 THE DEFENDANT: That was the reason I told you

14 that that plea was not correct.

15 That's the mandatory for trafficking. We were

16 going to make a deal. What kind of deal is going to be,

17 they offer the person six months, and the person doesn't

18 know what he's doing. Then they put him three years.

19 What is this about? That's a lie.

20 MS. WOLOSHIN: Your Honor, just so that the

21 record is clear, the defendant had a Fast Track hearing

22 on May 21st. Mr. Vella handled that hearing. And

23 Mr. Bartley has that plea agreement. He can give the

58

1 Court a copy of it so they have it in the file.

2 But it was to trafficking and the violation of

3 probation. The defendant was represented by an attorney

4 at that time. Obviously, Mr. Bartley, who has the plea

5 agreement -- and it was to trafficking, to violation of

6 probation, four years Level V, which included a

7 three-year minimum mandatory. I think the six months

8 related to the six months Level IV afterwards.

9 MR. BARTLEY: Yes. And we had a dialogue at

10 the time. And we made it very clear to the Court --

11 THE COURT: Go ahead with the violation of

12 probation.

13 (Pause.)

14 MR. BARTLEY: He indicates that he wishes to be

15 sentenced today, Your Honor.

16 THE COURT: Okay.

17 MR. BARTLEY: I ask the Court -- I renew my

18 request that the Court sentence him to 120 days Level V

19 and discharge as unimproved.

20 THE COURT: Mr. Lopez, the Court has found that

21 you're in violation of probation. And that's found

22 based on possessing drugs and throwing the drugs out the

23 window, which I believe occurred.

59

1 And it's the sentence of the Court that you be

2 placed in the custody of the Department of Corrections

3 effective March 6th, 2003, for a period of two years

4 Level V. That is incarceration. After serving 18

5 months, the remainder of the sentence is suspended for

6 six months at Level IV home confinement. You'll be held

7 at Level V for Level IV.

8 THE DEFENDANT: Why are you giving me this

9 sentence? What is it about?

10 THE COURT: Why am I giving you this sentence?

11 THE DEFENDANT: Why are you sentencing me with

12 this?

13 THE COURT: I'm sentencing you on the violation

14 of probation. You were on probation on my sentence for

15 possession with intent to deliver cocaine. You have a

16 three-year sentence suspended after the time served,

17 which was about 11 months, for two years at Level III

18 intensive probation. While you were on intensive

19 probation this violation arose. And I'm reimposing the

20 two years, suspending it after 18 months for Level IV.

21 THE DEFENDANT: My probation was almost done.

22 THE COURT: I don't really think so. I imposed

23 the sentence March 6th, 2002. So this was -- you got

60

1 arrested a year later. You have another year to go.

2 (The following exchange is not through the

3 interpreter.)

4 THE DEFENDANT: I've been doing more than one

5 year probation for more than one year. I just have six

6 more in probation. I got close to four months in

7 prison, and I do about 12 months outside. I got left

8 seven, eight months in probation. I don't understand

9 you. I got sentenced two years probation.

10 THE COURT: You got sentenced to three years in

11 prison. That was suspended effective March 6th of 2002

12 for two years Level III probation. So you had two years

13 probation starting last year on March 6th. You were

14 arrested on this charge March 6th this year. That makes

15 one year.

16 THE DEFENDANT: How much time do I have to be

17 in prison now?

18 THE COURT: 18 months. But it started on March

19 6th.

20 We'll mark a new case to be set down for trial.

21 THE CLERK: How many days?

22 THE COURT: Three days.

23 MR. BARTLEY: He's arguing that he should get

B-63

61

1  credit.

2          THE DEFENDANT: I need help. I don't

3  understand the situation.

           When I received my sentence for probation, they

5  ...t me in prison about one more month. Sentenced on the

6  case that I was sentenced, arguing that the papers were

7  not there, or something like that. Eighteen months in

8  prison is a lot of time. I'm doing good time in the

9  prison, you know. I'll do it, the program for changing

10  my life, I think, you know -- it's too heavy sentence

11  for me. I got a family. I really not committed this

12  crime. This really not proved, Your Honor.

13          THE COURT: It's sort of academic. The new

14  charges pending, until they get resolved, you're going

15  to be in jail anyway. So we'll schedule them for a

16  quick trial.

17          Court's in recess.

18          THE DEFENDANT: How many months in prison?

19          THE COURT: You have March 6th, the end of

20  June...

21          (Pause.)

22          THE COURT: You've got four of those months

23  pretty much done.

62

1          (Whereupon the proceedings concluded at 2:04

2  p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

21

22

23

63

STATE OF DELAWARE:

NEW CASTLE COUNTY:

           I, Domenic M. Verechia, Official Court Reporter

of the Superior Court, State of Delaware, do hereby

certify that the foregoing is an accurate transcript of

the proceedings had, as reported by me in the Superior

Court of the State of Delaware, in and for New Castle

County, in the case therein stated, as the same remains

of record in the Office of the Prothonotary at

Wilmington, Delaware, and that I am neither counsel nor

kin to any party or participant in said action nor

interested in the outcome thereof.

           WITNESS my hand this 22nd day of June, 2004.

                         _____

                         Domenic M. Verechia, RPR

                         Certification No. 162-PS



(11)

APR 1 4 2003

### PUBLIC DEFENDER OF THE STATE OF DELAWARE
ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

BRIAN J. BARTLEY
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5135

April 11, 2003

The Honorable Richard S. Gebelein
Superior Court Judges Chambers
New Castle County Courthouse
500 N King Street
Wilmington, DE 19801

    RE:   State of Delaware vs. Johnny M. Lopez
        ID No. 0303004588

2003 JUL 11 PH 4: 54

Dear Judge Gebelein:

    I visited with Mr. Lopez on Saturday April 4, 2003 at which time Mr. Lopez indicated that he has elected to proceed _pro se_ in these matters to date, including representing himself at his Preliminary Hearing.

    Please set this matter on a control for representation calendar so that the defendant's election to proceed _pro se_ as by myself can be made a matter of record.

Respectfully submitted,

Brian J. Bartley
Assistant Public Defender

BJB/ef
cc:  Mr. Johnny M. Lopez, Inmate

Exhibit B-21 "A"



PUBLIC DEFENDER OF THE STATE OF DELAWARE
ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

BRIAN J. BARTLEY
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5135

April 11, 2003

Mr. Johnny M. Lopez, Inmate
SBI No. 00459748
MPCJF Gander Hill
1301 E 12th Street
Wilmington, DE 19809

    RE:  State of Delaware v. Johnny M. Lopez
         ID No. 0303004588

Dear Mr. Lopez:

    This letter shall confirm that I met with you on Saturday,
April 5, 2003 to discuss your case.

    At the outset, you indicated that you wished to proceed pro se
and that you had represented yourself at the Preliminary Hearing.

    Towards the end of the meeting, you indicated that you might
want me to represent you rather than proceed pro se.

    Because you have a constitutional right to be represented by
counsel or by yourself as you elect, subject to Court approval, I
am requesting the Court to determine my status, if any, as counsel.
This ordinarily would not be necessary except for the fact that you
elected earlier in the proceedings to represent yourself.

    While there are certain decisions which are made by the client
(whether to plead guilty , whether to  testify and whether to
appeal) , all tactical and procedural decisions are made by counsel
except where  a person is representing himself.  Therefore, it is
important that a determination be made as to whether you wish to

B-22
Exhibit "B"

Mr. Johnny M. Lopez, Inmate
April 11, 2003
Page 2

represent yourself or be represented by counsel.

This may seem formal, but it is necessary to protect your rights, including both your right to represent yourself as well as your right to effective legal representation should you elect to be represented by counsel.

As I told you on Saturday, your Fast Track VOP/Case Review date has been set for May 21, 2003.

Thank you.

Very truly yours,

Brian J. Bartley
Assistant Public Defender

BJB/ef

B-23



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### ELBERT N. CARVEL STATE OFFICE BUILDING
### 820 NORTH FRENCH STREET, THIRD FLOOR
### P.O. BOX 8911
### WILMINGTON, DELAWARE 19801

**LAWRENCE M. SULLIVAN**
**PUBLIC DEFENDER**

**ANGELO FALASCA**
**CHIEF DEPUTY**

**BRIAN J. BARTLEY**
**ASSISTANT PUBLIC DEFENDER**

**TELEPHONE**
**(302) 577-5135**

November 19, 2003

The Honorable Richard S. Gebelein
Superior Court Judges Chambers
New Castle County Courthouse
500 N King Street
Wilmington, DE 19801

    RE:  State of Delaware vs. Johnny M. Lopez
         ID No. 0303004588

Dear Judge Gebelein:

    Trial is scheduled for tomorrow, Thursday, November 20, 2003.

    I must withdraw as counsel in this matter due to a serious
conflict of interest which came to my attention last evening when
I went to Gander Hill to meet with Mr. Lopez for purposes of trial
preparation.

    Mr. Lopez refused to consult with me, indicating that he did
not consider me to be his lawyer and advising me that the United
States District Court has authorized him to institute litigation
against Lawrence M. Sullivan and myself in connection with my
representation of him in the instant case.

    This morning I went to the United States District Court and
confirmed that Mr. Lopez had indeed commenced litigation.     The
subject matter of that litigation includes my representation of him
in this case. A copy of the District Court's Docket Sheet and Mr.
Lopez's complaint are enclosed herewith.

    Furthermore, beyond the pendency of Mr. Lopez's District Court
litigation, there are irreconcilable differences between Mr. Lopez

The Honorable Richard S. Gebelein
November 19, 2003
Page 2


and myself which would prevent me from effectively representing him
in this case.

    Mr. Lopez has refused to cooperate with me in the appropriate
attorney/client relationship.

    Mr.Lopez has consistently indicated that he did not wish me to
represent him.

    Mr. Lopez has repeatedly expressed an unqualified intention to
represent himself.

    I have previously filed a Motion to Withdraw. A copy of that
September 4, 2003 motion is enclosed herein.

Respectfully submitted,

Brian J. Bartley
Assistant Public Defender

BJB/ef
Enclosures
cc:  Andrew J. Vella, DAG (w/enc.)
    Prothonotary (w/enc.)
    Mr. Johnny M. Lopez, Inmate (w/enc.)

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 0303004588 |
| | ) | |
| JOHNNY LOPEZ, | ) | |
| | ) | |
| Defendant. | ) | |

UPON CONSIDERATION OF DEFENDANT'S FIRST
*PRO SE* MOTION FOR POSTCONVICTION RELIEF
**DENIED**

Submitted: December 7, 2007
Decided: January 25, 2008

This 25th day of January, 2008, it appears to the Court that:

1.     On November 11, 2003, Johnny Lopez ("Lopez") was convicted by a jury on the charges of Trafficking in Cocaine, Possession with Intent to Deliver Cocaine ("PWIDC"), Maintaining a Dwelling for Keeping Controlled Substances, and Possession of Drug Paraphernalia. The Court sentenced him to eighteen years at Level V, followed by probation. Lopez then sought to proceed *pro se* after his trial. After holding a hearing, Lopez was permitted to proceed *pro se* and file an appeal.[1]

---

[1] The Supreme Court permitted Lopez to proceed *pro se* and file a direct appeal by Order of the Supreme Court dated July 6, 2004. *See Lopez v. State*, 861 A.2d 1245, 1246 n.1 (Del. 2004).

1

2.    In his direct appeal, the Supreme Court affirmed the Superior

Court's convictions and sentences.  The Supreme Court first found that there

was no illegal search and seizure of drug evidence used against Lopez at trial

and that his arrest was supported by probable cause.[2]  The Supreme Court

explained:

> [T]he testimony at the suppression hearing reflected that Lopez,
> as a condition of his probation, had given his consent to the
> probation officers to enter his residence.  The record also
> reflects that those probation officers followed the proper
> statutory procedures for obtaining the administrative search
> warrant. . . .  The record reflects Lopez' highly suspicious
> behavior when the police came to the front door, his refusal to
> cooperate with the officers, and what appeared to be illegal
> drugs found outside the house.  Taken together with his positive
> urine test and the anonymous tip that Lopez was dealing drugs,
> the record reflects that it was reasonable for the officers to
> believe that Lopez was dealing illegal drugs.  Applying the de
> novo standard of review, we conclude that, under the totality of
> circumstances, the established facts constituted probable cause
> for Lopez' arrest as a matter of law.[3]

The Supreme Court also refused to address Lopez's ineffective assistance of

counsel claim because he failed to raise it before the Superior Court.[4]

---

[2] *Id.* at 1248-49.  Notably, no warrant was needed because he had consented to allow
police to enter his home at any time as condition of his probation. *Id.* at 1249.

[3] *Id.* at 1249 (citations omitted).

[4] *Id.* at 1251.

2

3.    Lopez now raises two grounds in this motion.[5]  First, defendant argues that his counsel was ineffective because his attorney did not "use any memoranda" in support of his suppression motions or at any other point.  He stresses that the officers who searched his premises and arrested him did not have probable cause to do so.  Lopez also submits that the evidence was legally insufficient to convict him of PWIDC.  Second, Lopez contends that his counsel was ineffective because he failed to call Lopez's probation officer as a witness.

4.    In response, defense counsel denies that he failed to submit memoranda in support of Lopez's suppression motion.  Counsel identifies two written motions for suppression that he filed with the Court.[6]  Although the motions were denied on factual and legal grounds, he notes that he filed papers for both motions and had oral argument on the second motion, thereby preserving the appellate record and obviating the need for additional legal memoranda.  Counsel also disputes Lopez's claim that his failure to call Lopez's probation officer as a witness was ineffective.  He explains that Lopez, whose crime was alleged to have occurred on March 6, 2003,

---

[5] Lopez has also filed a motion for a writ of habeas corpus arguing that his convictions were a product of an illegal search and seizure, and that his jury was selected in an unconstitutional manner.  That motion is not before the Court, however, and the Court will not address either argument.

[6] Docket 50.

3

testified at his suppression hearing that he had not seen his probation officer during the month of March. Considering the defendant's own admission to failing to make his probation appointments, counsel's decision to refrain from having Lopez's probation officer testify was therefore reasonable.

5. Prior to addressing the substantive merits of any claim for postconviction relief, the Court must first determine whether the defendant has met the procedural requirements of Superior Court Criminal Rule 61 ("Rule 61").[7] If the procedural requirements of Rule 61 are not met, in order to protect the integrity of the procedural rules, the Court should not consider the merits of a postconviction claim.[8]

6. Rule 61(i) imposes four procedural imperatives: (1) the motion must be filed within one year of a final order of conviction;[9] (2) any basis for relief must have been asserted previously in any prior postconviction proceeding; (3) any basis for relief must have been asserted at trial or on direct appeal as required by the court rules unless the movant shows

---

[7] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990). *See also Bailey v. State*, 588 A.2d 1121, 1127 (Del. Super. Ct. 1991).

[8] *State v. Gattis*, 1995 WL 790961, at *2 (Del. Super. Ct. Dec. 28, 1995) (citing *Younger*, 580 A.2d at 554).

[9] If the final order of conviction occurred before July 1, 2005, the motion must be filed within three years. If the final order of conviction occurred on or after July 1, 2005, however, the motion must be filed within one year. *See* Super. Ct. Crim. R. 61(i)(1) (July 1, 2005) (amending Super. Ct. Crim. R. 61(i)(1) (May 1, 1996)).

4

prejudice to his rights or cause for relief; and (4) any basis for relief must not have been formerly adjudicated in any proceeding. The bars to relief under (1), (2), and (3), however, do not apply "to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[10] Moreover, the procedural bars of (2) and (4) may be overcome if "reconsideration of the claim is warranted in the interest of justice."[11]

7. In this case, although Lopez's ineffective assistance of counsel claims are not procedurally barred, as explained *infra*, many of his arguments in support of these claims are barred. Specifically, Rule 61(i)(4) bars his argument that the police did not execute a valid search and seizure of his home because this has been formerly adjudicated by the Supreme Court in his direct appeal.[12] Rule 61(i)(3) also bars his claim that the State did not provide evidence to sustain his conviction for PWIDC because he failed to raise this ground on appeal.[13] Finally, Lopez's argument that the

---

[10] Super. Ct. Crim. R. 61(i)(5).

[11] *Id.* R. 61(i)(4).

[12] *See Lopez*, 861 A.2d at 1248-49.

9.    In this case, Lopez's ineffective assistance of counsel claim --
that counsel failed to submit legal memoranda -- fails as a matter of law and
as a matter of fact.  As explained in his affidavit, counsel submitted two
motions in writing to the Court.  He also supported the second written
motion with oral argument before the Court.  As a result, Lopez's argument
that counsel failed to file legal memoranda is simply inaccurate.

10.    Even assuming *arguendo* that counsel failed to file "sufficient"
legal memoranda on Lopez's behalf, the result would not have been
different.  All of the issues Lopez now raises were preserved for appeal and,
in fact, argued before the Supreme Court, as noted in its opinion affirming
the convictions.   Thus, counsel's decision not to file additional legal
memoranda was reasonable and would not have had any impact upon the
result.  In the end, the Supreme Court found sufficient evidence to support
Lopez's convictions.

11.    Lopez's second claim, that counsel was ineffective for failing to
call Lopez's probation officer, is similarly unavailing.  Lopez testified that
he had not seen his probation during the month of March, when the crime for
which he was convicted occurred.  Thus, his probation officer would not
have had any knowledge of Lopez's crime.   Even had counsel called

7

Lopez's probation officer, he could not have aided Lopez's defense. Accordingly, Lopez's second claim fails both prongs of *Strickland*.

12.    For all of the foregoing, Lopez's Motion for Postconviction Relief is hereby **DENIED**.

**IT IS SO ORDERED.**

*Peggy A Ableman*
Peggy L. Ableman, Judge

Original to Prothonotary

cc:    Johnny Lopez
       Brian J. Bartley, Esq.

EFiled: Mar 28 2008 3:42PM
Filing ID 19185472
Case Number 77,2008

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHNNY LOPEZ, | § | |
| | § | No. 77, 2008 |
| Defendant Below- | § | |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID No. 0303004588 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: March 26, 2008
Decided: March 28, 2008

Before **STEELE**, Chief Justice, **JACOBS** and **RIDGELY**, Justices.

## O R D E R

This 28th day of March 2008, upon consideration of the appellant's opening brief and the appellee's motion to affirm pursuant to Supreme Court Rule 25(a), it appears to the Court that:

(1)     The defendant-appellant, Johnny Lopez, filed an appeal from the Superior Court's January 25, 2008 order denying his motion for postconviction relief pursuant to Superior Court Criminal Rule 61. The plaintiff-appellee, the State of Delaware, has moved to affirm the judgment of the Superior Court on the ground that it is manifest on the face of the opening brief that the appeal is without merit. We agree and affirm.

(2)    In November 2003, Lopez was found guilty by a Superior Court jury of Trafficking in Cocaine, Possession With Intent to Deliver Cocaine, Maintaining a Dwelling for Keeping Controlled Substances, and Possession of Drug Paraphernalia. He was sentenced to a total of 18 years of Level V incarceration, to be followed by probation. Lopez' convictions and sentences were affirmed by this Court on direct appeal.[1]

(3)    In this appeal from the Superior Court's denial of his motion for postconviction relief, Lopez claims that a) the warrant authorizing the search of his residence was defective and the search was unconstitutional; b) there was insufficient evidence presented at trial to support the charge of Possession With Intent to Deliver Cocaine; c) his request to represent himself at trial was not properly considered by the trial judge; and d) his attorney provided ineffective assistance by failing to submit legal memoranda in support of his motion to suppress and failing to call Lopez' probation officer as a witness at trial.

(4)    When considering a postconviction motion pursuant to Rule 61, the Superior Court must review whether the procedural requirements of the rule have been met before reaching the merits of the claims.[2] Lopez' first claim of a defective search warrant and unconstitutional search was fully litigated at a pre-trial suppression hearing and on direct appeal. His third claim concerning his

---

[1] *Lopez v. State*, 861 A.2d 1245 (Del. 2004).
[2] *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991).

request to proceed pro se at trial was reviewed by this Court on direct appeal. Therefore, those claims are procedurally barred as formerly adjudicated.[3] Moreover, Lopez has failed to demonstrate why reconsideration of the claims is warranted in the interest of justice.[4] Lopez' second claim of insufficient evidence to support the charge of possession with intent to deliver was not raised at trial or on direct appeal. As such, the claim is procedurally defaulted.[5] Moreover, Lopez has failed to overcome the procedural default by demonstrating either cause and prejudice[6] or a colorable claim of a constitutional violation.[7]

(5)    Lopez' final claim is that his attorney provided ineffective assistance at trial. In order to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that his counsel's representation fell below an objective standard of reasonableness and that, but for his counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different.[8] Although not insurmountable, the Strickland standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable."[9] The defendant must make concrete allegations of

---

[3] Super. Ct. Crim. R. 61(i) (4).
[4] Id.
[5] Super. Ct. Crim. R. 61(i) (3).
[6] Super. Ct. Crim. R. 61(i) (3) (A) and (B).
[7] Super. Ct. Crim. R. 61(i) (5).
[8] *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).
[9] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).

ineffective assistance, and substantiate them, or risk summary dismissal.[10]  In the absence of any evidence of error on the part of Lopez' counsel that resulted in prejudice to him, we conclude that this claim also is unavailing.

(6)    It is manifest on the face of the appellant's opening brief that the appeal is without merit because the issues presented on appeal are controlled by settled Delaware law and, to the extent that judicial discretion is implicated, there was no abuse of discretion.

NOW, THEREFORE, IT IS ORDERED that, pursuant to Supreme Court Rule 25(a), the State of Delaware's motion to affirm is GRANTED.  The judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/Henry duPont Ridgely
Justice

---

[10] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

4